# No. 22-15997

IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### DE WITT LAMAR LONG,
*Plaintiff-Appellant,*

*v.*

### SGT. SUGAI et al.,
*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF HAWAI'I
J. MICHAEL SEABRIGHT, DISTRICT JUDGE • CASE NO. 1:19-CV-00235-JMS-RT

---

# APPELLANT'S REPLACEMENT
# OPENING BRIEF

---

**HORVITZ & LEVY** LLP
CURT CUTTING
REBECCA G. POWELL
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800

**PEPPERDINE CARUSO SCHOOL OF LAW
NINTH CIRCUIT APPELLATE
ADVOCACY CLINIC**
MAXWELL LYSTER (CERTIFIED LAW STUDENT)
MACY MERRITT (CERTIFIED LAW STUDENT)
24255 PACIFIC COAST HIGHWAY
MALIBU, CALIFORNIA 90263-3999

ATTORNEYS FOR PLAINTIFF-APPELLANT
**DE WITT LAMAR LONG**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... v

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 3

STATEMENT OF ISSUES PRESENTED.................................................. 4

STATEMENT OF THE CASE ................................................................... 6

    A.    DeWitt Lamar Long, a practicing Muslim, is approved
        for a non-pork diet in a Hawaii state prison, but
        Sergeant Rodney Sugai consistently tells him he is not
        on the special dietary list when he attempts to pick up
        food. Sugai serves Long a pork-contaminated meal,
        which makes him violently ill. ................................................ 6

    B.    Sugai harasses Long and banishes him from the dining
        room, forcing him to eat alone in his cell............................... 9

    C.    Sugai threatens, harasses, and belittles Long, who still
        suffers continuing issues receiving meals conforming to
        his religious practice. ........................................................... 10

    D.    Three days after filing his latest grievance against
        Sugai, Long is moved to a high-security facility without
        explanation. Long's quality of life deteriorates. ................... 13

    E.    During Ramadan, Long, whose religious beliefs require
        him to eat after sunset, is forced to choose between
        eating warm food four hours before sunset, or eating
        cold, congealed, and inedible food after sunset. ................... 15

    F.    At the high-security facility, Long can no longer attend
        Jumu'ah prayer services. Long is moved to Arizona
        three days after he files a step-three grievance
        complaining of his inability to attend Jumu'ah. ................... 16

i

G.  Long files a civil rights lawsuit against the prison officials. The district court dismisses Long's claim for injunctive relief at the screening stage. ..............................18

H.  The district court grants summary judgment on Long's retaliation claim against Chief of Security Lyle Antonio and Free Exercise claim against Sergeant Wyatt Lee. ........18

I.  Long's remaining claims proceed to trial and the district court rules in favor of Defendants on all claims......20

SUMMARY OF THE ARGUMENT .........................................................26

ARGUMENT ...................................................................................30

I.  The district court erred in dismissing Long's claims for injunctive relief at the screening stage...........................................30

A.  A court may not dismiss a complaint at the screening stage when, after accepting as true and liberally construing all factual allegations in a pro se prisoner's complaint, the complaint states a plausible claim. The court must also allow a plaintiff to cure any curable pleading defect. .....................................................................30

B.  District courts must apply the Prison Litigation Reform Act screening standard cautiously to avoid preventing access to the courts...............................................31

C.  Long stated a valid injunctive relief claim on the face of his complaint. .........................................................34

D.  Even if Long's complaint did not state a claim for injunctive relief, the district court should have granted leave to amend. .....................................................37

II.  The district court improperly dismissed Long's First Amendment claims against Antonio and Lee at summary judgment......................................................................38

A.    A court must reverse summary judgment when, viewing the record in the light most favorable to the nonmoving party, there is a triable issue of material fact. ........................................................................ 38

B.    On Long's First Amendment retaliation claim against Antonio, Long presented evidence showing genuine issues of material fact as to whether Antonio moved Long to the high-security facility to retaliate against Long for filing grievances ...................................... 39

    1.    The district court properly found Long met the first four elements of a retaliation claim. ................... 39

    2.    The district court erred in finding there was no triable issue of fact on the fifth element—whether Antonio's decision to transfer Long reasonably advanced a legitimate correctional goal. ..................... 41

C.    The district court improperly granted summary judgment on Long's Free Exercise claim against Lee. ......... 47

    1.    The district court applied the wrong standard and incorrectly held there was no genuine issue of material fact that Lee substantially burdened Long's religious practice. ............................................. 47

    2.    Long presented evidence that Lee's refusal to provide him with hot food during Ramadan did not serve any legitimate correctional goal ................... 50

III.   On the claims that went to trial, the district court made key factual findings that were unsupported by the evidence. ............. 55

A.    The district court drew an illogical and impermissible inference that Long was a significant threat to prison security. ................................................................. 55

    1.    This Court must find clear error in a lower court's unsupported and implausible factual finding. ............ 55

2.   The district court's unsupported factual conclusion that Long posed a significant security threat led to the dismissal of all his claims.................56

3.   The evidence presented at trial did not support the factual finding that Long posed a security threat..........................................................................59

B.   No evidence supported the court's denial of Long's Free Exercise claim against Antonio on the ground that transporting Long required increased "personnel commitments."........................................................................62

CONCLUSION ...................................................................66

STATEMENT OF RELATED CASES ....................................67

CERTIFICATE OF COMPLIANCE FOR BRIEFS .................68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*49er Chevrolet, Inc. v. General Motors Corp.*,
  803 F.2d 1463 (9th Cir. 1986) ............................................................... 7

*Albino v. Baca*,
  747 F.3d 1162 (9th Cir. 2014) ............................................................. 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................ 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................... 30, 32

*Blaisdell v. Frappiea*,
  729 F.3d 1237 (9th Cir. 2013) ................................................. 31, 37, 39

*Bradley v. Hall*,
  64 F.3d 1276 (9th Cir. 1995) ............................................................... 60

*Brodheim v. Cry*,
  584 F.3d 1262 (9th Cir. 2009) ............................................................. 40

*Bruce v. Ylst*,
  351 F.3d 1283 (9th Cir. 2003) ................................................. 40, 42, 43

*Doe v. Lawrence Livermore Nat'l Lab.*,
  131 F.3d 836 (9th Cir. 1997) ........................................................ 34, 35

*Earp v. Ornoski*,
  431 F.3d 1158 (9th Cir. 2005) ............................................................. 43

*Henderson v. Terhune*,
  379 F.3d 709 (9th Cir. 2004) ............................................................... 53

*Johnson v. Moore*,
  948 F.2d 517 (9th Cir. 1991) ............................................................... 36

*Johnson v. Ryan*,
  55 F.4th 1167 (9th Cir. 2022) ...................................................... 42, 43

*Jones v. Blanas*,
  393 F.3d 918 (9th Cir. 2004) ........................................................ 38, 60

*Jones v. Slade*,
  23 F.4th 1124 (9th Cir. 2022) ............................................................ 52

*Jones v. Williams*,
  791 F.3d 1023 (9th Cir. 2015) ...................................................... 47, 60

*LeMaire v. Maass*,
  12 F.3d 1444 (9th Cir. 1993) ........................................................ 19, 48

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ...................................................... 31, 37

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ............................................................ 30

*May v. Baldwin*,
  109 F.3d 557 (9th Cir. 1997) ........................................................ 47, 50

*Minidoka Irrigation Dist. v. Dept. of Interior*,
  406 F.3d 567 (9th Cir. 2005) .......................................................... 7, 20

*Molski v. Evergreen Dynasty Corp.*,
  500 F.3d 1047 (9th Cir. 2007) ............................................................ 34

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ............................................................ 37

*Neitzke v. Williams*,
  490 U.S. 319 (1989) .................................................................... 32, 33

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) ............................................................ 38

*Resnick v. Hayes*,
  213 F.3d 443 (9th Cir. 2000) .......................................................... 7, 30

vi

*Rhodes v. Robinson,*
408 F.3d 559 (9th Cir. 2005)................................................. 39, 41, 57

*Schroeder v. McDonald,*
55 F.3d 454 (9th Cir. 1995)....................................................... 40, 61

*Shakur v. Schriro,*
514 F.3d 878 (9th Cir. 2008)..................................................... *passim*

*Shephard v. Quillen,*
840 F.3d 686 (9th Cir. 2016)...................................................... 44, 45

*Skinner v. Switzer,*
562 U.S. 521 (2011)................................................................... 31, 32

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981)............................................................................ 47

*Turner v. Safely,*
482 U.S. 78 (1987)................................................................... *passim*

*United States v. Graf,*
610 F.3d 1148 (9th Cir. 2010)........................................................... 55

*Ward v. Walsh,*
1 F.3d 873 (9th Cir. 1993)......................................................... 26, 54

*Warsoldier v. Woodford,*
418 F.3d 989 (9th Cir. 2005)..................................... 35, 37, 47, 50, 51

*Watison v. Carter,*
668 F.3d 1108 (9th Cir. 2012)................................................ 39, 41, 42

*Williams v. Paramo,*
775 F.3d 1182 (9th Cir. 2015)........................................................... 31

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009).............................................................. 31

## Constitutions

United States Constitution

    amend. I ........................................................................... *passim*

    amend. VIII ........................................................ 3, 5, 19, 51

## Statutes

28 U.S.C. § 1291 ....................................................................... 4

28 U.S.C. § 1331 ....................................................................... 3

28 U.S.C. § 1343(a)(3) ............................................................... 3

28 U.S.C. § 1391(b)(2) ............................................................... 4

28 U.S.C. § 1651(a) ................................................................. 34

28 U.S.C. § 1915(d) (1996) ....................................................... 32

28 U.S.C. § 1915(e)(2) ............................................................. 32

28 U.S.C. § 1915(e)(2)(B)(ii) .................................................... 33

28 U.S.C. § 1915(g) ................................................................. 32

28 U.S.C. § 1915A ........................................................ 30, 32, 34

28 U.S.C. § 1915A(b)(1) ..................................................... 32, 33

42 U.S.C. § 1983 ...................................................... 2, 3, 18, 34

42 U.S.C. § 1997e ................................................................... 31

## Rules

9th Cir. R. 28-2.6 ........................................................................ 67

Fed. R. App. P. 4(a)(1) ................................................................ 4

Fed. R. Civ. P. 8(a)(2) ............................................................... 30

Fed. R. Civ. P. 15(a)(2) ............................................................. 31

Fed. R. Civ. P. 52(a)(6) ............................................................. 55

## Miscellaneous

141 Cong. Rec. 14,627 (1995) (statement of Sen. Orrin Hatch) ............ 33

Am. Halal Found., *What is Halal? What Halal Means,*
https://halalfoundation.org/insights/what-is-halal/ ............................ 6

Prison Litigation Reform Act, Pub. L. No. 104-134, § 804(a)(5),
110 Stat. 1321, 1321-74 ....................................................... 32

Religious Land Use and Institutionalized Persons Act of
2000, Pub. L. No. 106-274, 114 Stat. 803 ........................................ 51

## APPELLANT'S REPLACEMENT OPENING BRIEF

## INTRODUCTION

DeWitt Lamar Long, a devout Muslim, simply wanted to eat meals that comported with his faith. But at Halawa Correctional Facility ("Halawa"), Long repeatedly faced obstacles and harassment in obtaining non-pork meals. Sergeant Rodney Sugai, who oversaw the kitchen, repeatedly claimed Long was not entitled to non-pork food, harassed Long when he tried to pick up his meals, and served Long pork-contaminated food. After Long complained about not receiving the meals he was entitled to, Sugai banished Long from the cafeteria and forced him to eat alone in his cell. Then, Chief of Security Lyle Antonio transferred Long to a high-security facility where he had reduced access to the phones and lost access to the law library, microwave, and, most importantly, midday Friday prayer services, known as Jumu'ah. Long spent Ramadan, a period during which Muslims fast from sunrise to sunset, at the high-security facility where Sergeant Wyatt Lee served Long food early in the afternoon, forcing Long to choose between breaking his fast or eating after sunset, when the food had congealed and become inedible.

1

Long filed a pro se civil rights suit against Sugai, Antonio, and Lee under 42 U.S.C. § 1983, raising First Amendment Free Exercise and retaliation claims and seeking injunctive and monetary relief. Without the benefit of any briefing on the issue, the district court dismissed Long's injunctive relief claim with prejudice. Even though Long alleged ongoing unconstitutional policies and practices at Halawa, the district court ruled he had no basis to seek injunctive relief. The district court did not give Long a single opportunity to amend his complaint.

The district court then granted summary judgment on Long's retaliation claim against Antonio regarding the transfer to the high-security facility, finding that Antonio's actions were motivated solely by legitimate penological goals. This was error because the court resolved credibility questions in favor of Antonio—rather than drawing all inferences in favor of Long—and ignored Long's evidence that Antonio's decision to transfer was retaliatory and that his stated rationale was pretextual. The court also incorrectly granted summary judgment on Long's Free Exercise Claim against Lee based on Lee's decision to serve Long's meals hours before he was able to eat them. The court analyzed

Long's claim under the Eighth Amendment, instead of considering whether Lee's conduct substantially burdened Long's exercise of his religion and violated the First Amendment.

Finally, the district court rejected all of Long's remaining claims based on factual findings that Long was a threat to prison security and that transferring Long from the high-security facility to the medium-security facility to attend Jumu'ah services would have placed an unreasonable burden on prison resources. But at trial, there was no evidence to support the notion that Long was a security threat. And the evidence at trial showed that transferring Long to the medium-security facility to attend Jumu'ah prayer services would not have required additional prison resources. Relying on these factual findings, the district court improperly found against Long on his Free Exercise and retaliation claims.

## JURISDICTIONAL STATEMENT

Long filed suit in the United States District Court of Hawaii under 42 U.S.C. § 1983. (2-ER-91.) The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Venue was proper

in the District of Hawaii because the constitutional violations occurred in that district. *See* 28 U.S.C. § 1391(b)(2).

On June 21, 2022, the district court entered its final judgment, embracing and disposing of all claims. (1-ER-87–88.) This Court has jurisdiction under 28 U.S.C. § 1291. Long timely filed a Notice of Appeal on July 6, 2022. 2-ER-179; *see* Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES PRESENTED

(1)     Long alleged Halawa Correctional Facility, the prison he filed his complaint from, engaged in policies and practices violating his religious rights. Did the court err at the screening stage when it dismissed his claim for prospective injunctive relief without leave to amend?

(2)     On summary judgment, Antonio admitted he moved Long to a high-security area because of his grievances, and Long presented evidence of a retaliatory and pretextual motive. Did the court err in finding no triable dispute of fact on Long's retaliation claim against Antonio?

(3)     On summary judgment, Long presented evidence that during Ramadan, Lee forced him to choose between eating fresh food

before sunset, in violation of his religious beliefs, or eating congealed, inedible food after sunset that worsened his stomach ulcers. Did the district court err in applying Eighth Amendment principles to conclude that there was no triable dispute of fact on Long's Free Exercise Claim against Lee?

(4)    In a bench trial, Defendants presented evidence that Long was "argumentative" but never testified he was a security threat and never presented evidence that Long was disciplined or even written up for any misconduct. Did the district court clearly err in making a factual finding that Long was a "significant" threat to prison security, and then using that finding to enter judgment against Long on his remaining claims?

(5)    At trial, Antonio testified there were transfers running for most of the day between the high-security area and the medium-security area where religious services were held, and no additional resources would be needed to transfer inmates during those hours. Did the district court clearly err in finding there were no ready alternatives to accommodate Long's religious need to attend midday services?

## STATEMENT OF THE CASE

**A.    DeWitt Lamar Long, a practicing Muslim, is approved for a non-pork diet in a Hawaii state prison, but Sergeant Rodney Sugai consistently tells him he is not on the special dietary list when he attempts to pick up food. Sugai serves Long a pork-contaminated meal, which makes him violently ill.**

Long has been incarcerated at Halawa Correctional Facility since December 2015, where he was initially assigned to the Medium Facility, Halawa's general-population, medium-security housing area. (2-ER-125.) Upon his arrival, Long requested a halal diet to accommodate his Islamic faith.[1] (2-ER-145.) In his request, Long noted in recognition of the potential unavailability of halal meals, "a non-pork diet [would] suffice." (2-ER-146.) Over the next two weeks, however, the kitchen served Long pork seven times, and only once did prison officials offer

---

[1] A halal diet is governed by Islamic dietary requirements specified in the Quran. The halal diet not only forbids pork and pork products, but also specifies the manner in which animals are to be slaughtered and prepared. *See* Am. Halal Found., *What is Halal? What Halal Means,* https://halalfoundation.org/insights/what-is-halal/ (last visited Apr. 11, 2023); *see also Shakur v. Schriro*, 514 F.3d 878, 882 n.2 (9th Cir. 2008) ("Halal meat is ritually slaughtered and prepared according to Islamic specifications. Muslims are instructed to eat meat only if it is Halal. Meat that is not Halal is referred to as Haram and is forbidden.").

him a replacement non-pork meal.[2] (2-ER-110.) Long filed at least four other requests for a non-pork diet during this time, which did nothing to resolve the ongoing problem. (2-ER-110.) At the end of the two weeks, Long filed a step-one grievance regarding this inability to get on the special dietary list kitchen staff used to determine who should receive a different meal. (2-ER-110.) Five days later, Brian Watanabe, the food service officer, approved Long's request for a non-pork diet, stating Long would receive a vegetarian or non-pork meal. (2-ER-146.)

Long was fed appropriately for about a month, until one day he went to pick up his meal but noticed there was pork in it. (2-ER-107.) He notified Sugai, the official responsible for the kitchen area at the medium-security facility, about the pork in his vegetarian meal. (2-ER-

---

[2] The factual background recited here is stated in the light most favorable to Long, in accordance with the applicable standard of review when reviewing a district court's dismissal of claims in a screening order and grant of summary judgment. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000); *49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1466 (9th Cir. 1986) (noting that on review of summary judgment, this Court views the evidence in the light most favorable to the nonmoving party). Later in the recitation of facts, Long will recite the evidence at trial in the light most favorable to Defendants for purposes of his argument that the district court's findings of fact following a bench trial lacked substantial evidence, in accordance with the applicable standard of review for that challenge. *Minidoka Irrigation Dist. v. Dept. of Interior*, 406 F.3d 567, 572 (9th Cir. 2005).

107, 130.) Sugai then gave him another supposedly vegetarian meal wrapped in plastic. (2-ER-107.) Long started eating the wrapped meal, but again found strands of pork in the food. (2-ER-107.) Long became nauseated, his head ached, and he vomited, forcing him to go to the medical unit. (2-ER-107.) A few days later, Long filed a step-two grievance renewing the step-one grievance regarding the dietary list, because prison officials had still not responded or placed him on the non-pork diet list. (2-ER-148.) Along with Long's step-two grievance, the Halawa chaplain, Charles Noland, issued a second request to put Long on a halal diet, which Watanabe approved. (2-ER-149.)

From this point on, while in the medium-security facility, Long continually had problems receiving his religious meals. (2-ER-98.) Sugai would routinely deny Long his non-pork meals, claiming Long was not on the special diet list even after multiple requests from Long and Noland. (2-ER-98.) Kitchen workers told Long that Sugai directed them to give Long smaller portions, and Long believed that Sugai was also purposefully using pork-contaminated utensils to make his meals. (2-ER-98; *see* 2-ER-161 (a kitchen inmate worker stating Sugai "would have me or tell me to make Mr. Long's trays smaller than other trays").)

8

Long lost weight due to the smaller portions. (3-ER-217.) Sugai often exiled Long from the cafeteria and routinely sent Long back to his module without food. (2-ER-98; 2-ER-109.)

### B. Sugai harasses Long and banishes him from the dining room, forcing him to eat alone in his cell.

Several months later, Long filed a grievance regarding Sugai's ongoing failure to consistently accommodate his religious dietary needs. (2-ER-109.) Long complained about Sugai being disrespectful, intimidating, and abusive when Long had requested appropriate meals over the preceding months. (2-ER-109; *see also* 2-ER-164, 167, 170, 173 (numerous inmates who worked under Sugai describing him as harassing, insulting, intimidating, and threatening).) And on the day Long filed the grievance, Sugai called Long a "crybaby" for reporting Sugai's behavior to another official. (2-ER-109.)

Conditions immediately worsened after Long filed his grievance against Sugai. The very next day, Sugai "impl[e]mented his own version of MTM" (short for "meals to module") for Long. (2-ER-140.) MTM is a program that allows inmates with disabilities or medical issues to receive meals in their cells. (2-ER-140, 155.) Even though Long did not qualify for MTM, Sugai would force Long to pick up often cold and

smaller-portioned meals and go back to his cell to eat alone, banishing

Long from the dining hall and depriving him of social interactions with

other inmates. (2-ER-157.) The modified program forced Long to

personally interact with Sugai every day when picking up his meals,

where Sugai would "harass," "taunt," "antagoni[z]e," and "abuse" Long.

(2-ER-157.) Sugai's vindictive MTM program lasted for the next eight to

nine months. (2-ER-157.)

A couple of months after Sugai implemented his "own version" of

MTM for Long, a prison official assaulted Long while he was trying to

pick up food to take back to his module. (2-ER-151.) The officer slapped

Long in the face, causing his lips to swell, and knocked Long's food tray

out of his hands. (2-ER-151.) After the incident, the sergeant on duty

refused to give Long a grievance form or take him to the medical unit.

(2-ER-151.)

### C. Sugai threatens, harasses, and belittles Long, who still suffers continuing issues receiving meals conforming to his religious practice.

Ten days later, Long renewed his grievance about Sugai's abuse

and "crybaby" comment. (2-ER-152.) Scott Harrington, the warden,

denied this step-two grievance and concluded Sugai had acted

10

"professionally." (2-ER-152.) The warden concluded Long was "not on a non-pork diet or any other special diet" at the time of the incident and had refused a vegetarian meal. (2-ER-152.) The warden reached this conclusion months after Long and Noland filed, and Watanabe approved, requests to place Long on a halal or non-pork diet. (*See* 2-ER-149, 147.) Long then filed a final-step grievance appealing Harrington's response. (2-ER-153.) Long reiterated he was in fact on the non-pork diet list and stressed that he did not refuse a vegetarian meal. (2-ER-153.) Long also renewed his complaint against Sugai, filing a step-three grievance, in which he added Sugai had refused to give him a meal that day, and had refused to give him meals many times in the past. (2-ER-153.)

About a month later, Long had another incident with Sugai. (2-ER-154.) When Long went to pick up his meal, Sugai forced him to stand at a line on the floor, something no official had ever told Long to do. (2-ER-154.) Long did not stop at the line and proceeded to get his food like the dozens of times before. (2-ER-154.) Sugai then aggressively yelled and swore at Long claiming, "I don't have to feed you." (2-ER-154.) Sugai again called Long a "crybaby" and tried to provoke Long

into an altercation. (2-ER-154.) Long again pleaded with the prison to stop Sugai's harassment, taunting, cursing, and disrespect; Long wanted to get his meals without a confrontation. (2-ER-154.)

The next month, Long received a response to his most recent step-three grievance. (2-ER-153.) The response stated Long was not on a special diet at the time of the incident, and had not been on the non-pork diet list since his arrival thirteen months before—even though he had requested non-pork food as soon as he arrived. (2-ER-153.) The response advised Long to submit a request to "see if a 'non-pork diet tray' is available." (2-ER-153.) Long also received a response to his complaint about Sugai's swearing and threats to withhold food that stated the complaint "was handled." (2-ER-154.)

About four months later, Long asked about the MTM program criteria and learned it was only meant to be used for inmates who could not walk to the cafeteria. (2-ER-155.) A few days later, Long renewed his grievance about Sugai's swearing and threats to withhold food that "was handled," claiming Sugai was still harassing him. (2-ER-156; *see* 2-ER-154.) Long described two recent incidents during which Sugai swore at and threatened Long during meal pickup. (2-ER-156.) Sugai swore

12

and yelled at Long for talking to kitchen workers after a worker asked Long about his diet. (2-ER-156.) Long did not have any problems picking up food when Sugai was not working. (2-ER-156.)

Several weeks later, Long received a response to his renewed grievance with the warden stating he would "address professionalism standards with Sgt. Sugai." (2-ER-156.) Three days later, Long filed a step-three grievance, renewing his complaints about Sugai's abuse. (2-ER-157.) Long believed the punitive MTM program, smaller meal portions, and ejection from the dining hall were all in retaliation for his grievances against Sugai. (2-ER-157.)

> **D.    Three days after filing his latest grievance against Sugai, Long is moved to a high-security facility without explanation. Long's quality of life deteriorates.**

Three days later, Long was transferred from the medium-security facility to a general population unit in the Special Needs Facility, a high-security facility at Halawa. (2-ER-116; 2-ER-157 (filing step-three grievance on May 5, 2017); 2-ER-158 (filing grievance stating he was moved to the high-security facility on May 8, 2017).) The high-security facility houses inmates with certain medical conditions and those who have broken rules or policies. (2-ER-116; *see also* 2-ER-160 (Long noting

13

"[e]very inmate in my unit [at the high-security facility] is here for disciplinary reasons").) Prison officials did not move Long because of a qualifying medical condition, and there was no evidence that any official ever disciplined or wrote up Long for misconduct. (*See* 2-ER-158 (prison officials refusing to explain the reasons for Long's transfer); 3-ER-336 (Sugai testifying that he never wrote Long up for misconduct).) No one ever informed Long why he was moved. (2-ER-158.)

Shortly after arriving at the high-security facility, Long filed a grievance, seeking a reason for the move. (2-ER-158.) Antonio responded by saying that Long was still in general population housing like before in the medium-security facility, and thus the transfer was not punitive and did not require an explanation. (2-ER-158.) Long, dissatisfied with Antonio's response, renewed his grievance because he felt the move to the high-security facility was punitive. (2-ER-159.) Long's access to the phone was greatly restricted, and he lost access to the law library and microwave; he could not order and receive commissary; and he critically could not attend Jumu'ah services, an Islamic communal prayer held on Fridays at noon. (2-ER-99, 159; *see* 1-ER-24; 2-ER-141–42.) Long believed Antonio moved him to the high-

14

security facility as retaliation for filing grievances against Sugai. (2-ER-159; *see* 1-ER-47.) Long's case manager, Ms. Torres, told Long that Antonio transferred him because of the "kitchen incident" described in his step-three grievance filed right before the move. (2-ER-159.)

**E.  During Ramadan, Long, whose religious beliefs require him to eat after sunset, is forced to choose between eating warm food four hours before sunset, or eating cold, congealed, and inedible food after sunset.**

Shortly after Long was transferred to the high-security facility, the month-long celebration of Ramadan began, requiring Long to fast from sunrise to sunset, which was about 7:30 p.m. (2-ER-100.) Officials would deliver Long's meals to his cell around 3:30 p.m. (2-ER-100.) After the food sat out for four hours, it became cold and did not meet the prison's own food safety policies for food temperature. (2-ER-100–01.) Long described the meat had "harden[e]d" and congealed to the point of becoming inedible. (2-ER-101 (stating that the food turned into a gelatin-like paste and was basically ruined).) To avoid having to eat cold and repulsive food when he broke fast, Long asked Sergeant Wyatt Lee, the officer in charge of his unit, if he could call the kitchen to request a hot meal or allow Long to use a microwave to reheat the

meals. (2-ER-100, 175–76.) Lee would not call the kitchen because it was already closed and would not let Long use the staff microwave, asserting it was against prison policy. (2-ER-100, 175–76; *see* 2-ER-122.) Since Lee would not help, Lee forced Long to choose between breaking his fast in contravention of his religious beliefs and eating unsafe and congealed food, which made his stomach ulcers worse. (2-ER-100, 176.)

**F.    At the high-security facility, Long can no longer attend Jumu'ah prayer services. Long is moved to Arizona three days after he files a step-three grievance complaining of his inability to attend Jumu'ah.**

Toward the end of Ramadan, Long complained he could no longer attend Jumu'ah prayer on Friday afternoons like he could in the medium-security facility. (2-ER-108.) Long got no response to this grievance and heard nothing regarding his other requests made to Antonio to attend Jumu'ah services at the medium-security facility. (*See* 2-ER-108.) Long was especially upset because Jumu'ah is critical during Ramadan. (2-ER-108.) Long felt Antonio "denied [him] the opportunity to practice [his] religion" during a very important time of the year for a practicing Muslim. (2-ER-108.) During his time at the high-security facility, Long was never given the opportunity or space at the high-

16

security facility to meet his "religious duties and obligations with [Jumu'ah] services." (2-ER-143.)

The day after Long filed the grievance about the lack of Jumu'ah services, he filed a final, step-three grievance seeking an explanation for his move to the high-security facility. (2-ER-160.) Long noted that other inmates in the high-security facility were there for disciplinary reasons or because they were in protective custody. (2-ER-160.) Three days after filing the step-three grievance, he was moved to a private prison in Arizona, but he was later transferred back to Halawa. (2-ER-160, 177; *see* 1-ER-15; 2-ER-91, 106.)

Antonio later conceded that his decision to move Long to the high-security facility was spurred by Long's grievances but claimed it was "in recognition of," "not in retaliation for [Long's] grievances." (2-ER-120.) Antonio explained Sugai "had disciplined [Long] for his behaviors at meals," so moving Long was the best way to prevent future conflicts, investigate Long's claims, and prevent retaliation. (2-ER-119.) Antonio also explained Long could not attend Jumu'ah services at the medium-security facility because the prison did not have the resources to move him from the high-security facility to the medium-security facility.

17

(2-ER-117.) Antonio also asserted there were "[s]imilar opportunities" to engage in religious activities at the high-security facility, without providing any examples of any religious programs or services at the high-security facility. (2-ER-117.)

## G. Long files a civil rights lawsuit against the prison officials. The district court dismisses Long's claim for injunctive relief at the screening stage.

Long filed a § 1983 claim alleging Free Exercise violations in the district court against Sugai, Lee, and Antonio, and First Amendment retaliation claims against Lee and Antonio. (2-ER-91–93, 98–101.) He requested both monetary damages and injunctive relief. (2-ER-105.)

Among other claims, the district court dismissed Long's injunctive relief claim against all defendants named in their official capacities because the court concluded Long was only challenging "events that began and ended approximately two to three years ago." (1-ER-7.)

## H. The district court grants summary judgment on Long's retaliation claim against Chief of Security Lyle Antonio and Free Exercise claim against Sergeant Wyatt Lee.

Later, Defendants filed a motion for summary judgment with respect to Long's remaining claims. (2-ER-113–14.) The court granted the motion in part and denied it in part. (1-ER-14.)

18

The court granted summary judgment on Long's Free Exercise claim against Lee, which was based on the fact that during Ramadan his food was delivered to his cell at 3:30 p.m. and became congealed and inedible by the time his fast was over at sunset. (1-ER-33–34.) The court found this claim not actionable, citing to *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993), which held that serving prisoners cold food is not cruel and unusual punishment violating the Eighth Amendment. (1-ER-34.) The court added that Long did not point to any adverse consequences from being served the inedible food. (1-ER-33–34.)

The court also granted summary judgment on Long's retaliation claim against Antonio, which was based on transferring Long to the high-security facility, where Long could not attend Friday Jumu'ah services. (1-ER-47–51.) The court acknowledged that suspect timing provided some evidence of retaliatory intent and that Antonio admitted he transferred Long because of his grievances, but the court ultimately concluded that Antonio acted based on a legitimate correctional goal. (1-ER-48–51.)

## I.    Long's remaining claims proceed to trial and the district court rules in favor of Defendants on all claims.

The case proceeded to trial on Long's Free Exercise claim against Antonio and his Free Exercise and retaliation claims against Sugai. (1-ER-56.)[3] At trial, Long attempted to introduce declarations of inmate kitchen workers to support his account of his disputes with Sugai. (3-ER-248.) The declarations stated that Sugai was a bully who ran the kitchen and that Sugai had directed them to make Long's trays smaller. (2-ER-161, 164, 165–67, 173; *see also* 3-ER-248.) Long, trying the case pro se, was not aware that those out-of-court statements would be inadmissible at trial, and the district court excluded them as hearsay. (3-ER-247–48.)

The trial began with Long testifying about his experience at Halawa. (3-ER-189.) Long recounted the numerous incidents he had when picking up his meals. (3-ER-190–97.) Sugai told him he was not on the special dietary list, and Long inadvertently ate pork that was in

---

[3] These facts recite the evidence at trial in the light most favorable to the defendants for the purposes of Long's challenges to the sufficiency of the evidence supporting the judgment, in accordance with the standard of review. *Minidoka Irrigation Dist.*, 406 F.3d at 572.

his tofu and cabbage meal, making him ill. (3-ER-193–95.) After the pork consumption incident, Sugai told Long he could no longer eat in the chow hall, meaning he had to eat alone in his cell and pick up his food from the "middle," where employees entered the kitchen. (3-ER-194–96.) Long had to interact with Sugai at this entrance, where Sugai would belittle Long and call him a crybaby. (3-ER-196.) Sugai turned him away from the entrance at least three times, forcing Long to go without food. (3-ER-197.) Long never saw another religious inmate having to pick up their meals from the middle or forced to eat alone in their cell. (3-ER-200.)

Long also discussed his move to the high-security facility and testified that no official ever provided a reason for the transfer. (3-ER-203–04.) Long recounted the dramatic consequences of living at the high-security facility: he had much more limited access to the phones and commissary; he could no longer use a microwave or attend Jumu'ah prayer services; and officials strip-searched him frequently. (3-ER-207–08.) Officials did not respond to his requests for Islamic services at the high-security facility, and none were offered. (3-ER-210–11.)

21

Lastly, Long testified about other religious barriers. (3-ER-230–32, 238.) Long had no Kufi, a traditional Islamic brimless hat, or prayer mat in 2016 and 2017. (3-ER-230–32.) Long used a shirt as a Kufi and a towel as a prayer mat. (3-ER-232.) Long eventually received a prayer mat and Kufi, but officials sometimes would not let Long wear a Kufi. (3-ER-230–31.)

Next, Antonio testified. (3-ER-257.) He stated he had no part in determining the religious programs offered to inmates. (3-ER-266–68.) However, he conceded that the prayer services could have been provided at the high-security facility, which would only have required the civilian volunteer who led the services at the medium-security facility to go to the high-security facility. (3-ER-270.) Antonio also explained that the prison was unable to transfer Long back to the medium-security facility for prayer services because prison policy requires two correctional officers to restrain the inmate in a secure transport vehicle when transferring inmates between facilities. (3-ER-269–70.) But he testified that inmates are taken from the high-security facility to the medium-security facility if they need medical attention. (3-ER-271.) Antonio stated that transport between the medium-security facility and high-

22

security facility runs daily from 6:00 a.m. to 6:00 p.m. (3-ER-271.)
Antonio then stated it would take additional officers from other posts
and additional resources, but only when transferring inmates outside
the timeframe of 6:00 a.m. to 6:00 p.m. (3-ER-272.)

Next, Sugai testified. (3-ER-302.) Although Long testified at trial
he had to eat in isolation for six to eight months (3-ER-196), Sugai
testified that during his ten years serving as a sergeant at Halawa, he
sent an inmate back to his cell to eat in isolation only five or fewer
times (3-ER-319–20). Sugai denied the allegation that he had sent Long
back to eat in his cell in isolation for a period of six to eight months
straight. (3-ER-321.) Sugai revealed, however, that a few times, "two to
three times at the most," he had sent Long back to his cell to eat his
meals in isolation because Long was "argumentative" with the food
service staff about the food provided to him. (3-ER-323–24.)

Sugai testified that there was a practice of sending inmates back
to their cell to eat in isolation if they became argumentative or
disruptive. (3-ER-335.) When asked whether Long had ever been
disrespectful or disruptive when he came to get his meals, Sugai
answered he recalled that more often, Long would be argumentative

23

and debate his dissatisfaction with the food with the kitchen staff. (3-ER-336.) Sugai conceded that he never wrote up Long for any sort of disruptive or threatening behavior during meal times. (3-ER-336.)

Food services manager Lance Panui testified that the procedure regarding Ramadan meals included packaging hot food in a hot box which would keep the food warm until officials delivered the food at sunset. (3-ER-397–98.) No witness explained why this procedure was not used for Long's meals during Ramadan.

The district court entered judgment for Defendants on all three of Long's claims. (1-ER-88.) Regarding Long's Free Exercise claim against Sugai for sending Long back to his cell to eat in isolation, the court concluded that legitimate penological interests justified Sugai's orders. (1-ER-76–79.) The court found Sugai credible when he testified that he only sent Long back to his cell a few times, not for six to eight months, and only for "security reasons." (1-ER-65–66.) Although no one had testified that Long's behavior was threatening, the court found that Long posed a "significant threat" to institutional security and Sugai's actions were justified by Long's purportedly threatening behavior. (1-ER-78–79.) Although Sugai stated only that Long was

"argumentative" (1-ER-65), and agreed Long had never been written up (3-ER-336), the court held it would not "second-guess Sgt. Sugai's judgment as to the severity of" the altercations that caused him to send Long back to his cell to eat in isolation (1-ER-78–79).

The court rejected Long's retaliation claim against Sugai based on the same analysis as the Free Exercise claim against Sugai, finding that there was a legitimate penological interest in sending Long to eat in isolation in his cell because of "security reasons." (1-ER-65, 85–87.)

As to the Free Exercise claim against Antonio for transferring Long to the high-security facility where he could not attend Jumu'ah prayer services, the court found that Antonio credibly testified that he had no ability to create or maintain religious services, and did not remember receiving a request from Long to attend Islamic services. (1-ER-70.) The court held the transfer was in furtherance of a legitimate penological interest, based on the premise that Long's presence at the medium-security facility would have a "significant impact on institutional security given the rising tensions between [Sugai and Long]." (1-ER-82.) The court also found that if Antonio had spent the time to comply with union rules in order to transfer Sugai

instead of Long, that would have delayed separating Long and Sugai and increased the threat to institutional security. (1-ER-82.) Lastly, the court found it was infeasible to transport Long from the high-security facility to the medium-security facility to attend Jumu'ah services on Fridays during Ramadan at noon. (1-ER-71.) The court did not address the feasibility of having the medium-security facility's religious practitioner come to the high-security facility to conduct Jumu'ah prayer services. (*See* 3-ER-270.)

After final judgment, Long timely appealed. (2-ER-179.)

## SUMMARY OF THE ARGUMENT

"The right to the free exercise of religion is to be jealously guarded. It is the right of a human being to respond to what that person's conscience says is the dictate of God. It is not a right to be readily trammeled by the state." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). Long, a devout Muslim, simply tried to eat a diet that comported with the dictates of his Islamic faith. Instead of ensuring Long had a suitable religious diet, prison officials punished, harassed, and retaliated against Long for asserting his fundamental right to religious exercise.

26

The district court's judgment should be reversed on several bases.

First, the district court erred in dismissing Long's claim for injunctive relief at the screening stage. Long alleged ongoing violations of federal law to support an injunction claim. Long requested that the prison reassess its policies and procedures for Ramadan meals and religious services, implying a continuing risk of constitutional violations. Long was still subject to these procedures because he was housed at Halawa when he filed his complaint. At the very least, the court should have granted Long leave to amend his complaint to make these factual allegations clearer.

Second, the district court erred in granting summary judgment on Long's retaliation claim against Antonio. Long raised triable issues of material fact as to whether Antonio retaliated against Long for filing grievances. A prison official retaliates against an inmate when the official, without a legitimate correctional goal, takes an adverse action in response to the inmate's protected conduct sufficient to chill the exercise of the inmate's First Amendment rights. Long provided evidence that although Antonio professed a legitimate correctional goal,

he in fact acted with a retaliatory motive, and his stated justifications were a pretext to punish Long for filing grievances.

Third, the district court erred in granting summary judgment on Long's Free Exercise claim against Lee. A prison official substantially burdens an inmate's religious practice when the official's conduct exerts substantial pressure on an inmate to violate his religious beliefs and is not reasonably related to legitimate penological interests. Long raised triable issues of material fact as to whether Lee substantially burdened Long's religious practice by forcing Long, who was fasting for Ramadan and could not eat until sundown, to eat warm food in the afternoon and break his fast, or eat congealed and inedible food after sunset. Long demonstrated a material dispute as to whether Lee's actions exerted substantial pressure on Long to break his Ramadan fast without any legitimate penological interests.

Fourth, the district court made an unsupported factual finding at trial that Long was a threat to prison security, even though there was no evidence whatsoever that Long had ever been threatening or dangerous. No one ever testified that Long posed a security threat to the prison. To the contrary, Defendants conceded that he was never

written up for behavioral discipline. Yet this singular unsupported factual finding was the primary basis for the court's conclusion that Defendants had a legitimate penological interest in their adverse actions against Long, leading to the court's judgment against Long on all three of his claims that remained for trial.

Finally, the district court made an unsupported factual finding that transferring Long back to the medium-security facility would have required increased personnel commitments based on the evidence produced at trial. This finding misconstrued the evidence at trial, which only posited that increased personnel would be required *outside* the main working hours of the day, even though Long sought to attend prayer services that began at noon.

# ARGUMENT

I.  **The district court erred in dismissing Long's claims for injunctive relief at the screening stage.**

   A.  **A court may not dismiss a complaint at the screening stage when, after accepting as true and liberally construing all factual allegations in a pro se prisoner's complaint, the complaint states a plausible claim. The court must also allow a plaintiff to cure any curable pleading defect.**

This Court reviews de novo the district court's dismissal of a complaint under 28 U.S.C. § 1915A for failure to state a claim. *Resnick*, 213 F.3d at 447. To state a claim, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), alleging "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). In addition, courts have a duty to "give a liberal construction to the filings of pro se

30

litigants, especially when they are civil rights claims by inmates."

*Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013).

Leave to amend should be freely granted when justice so requires.

Fed. R. Civ. P. 15(a)(2). A district court should grant leave to amend

even if the pleadings do not request it, "unless . . . the pleading could

not possibly be cured." *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir.

2000) (en banc). This court reviews the district court's decision to

dismiss with prejudice for abuse of discretion, but if a pleading defect

could have been cured by amendment, the district court's dismissal with

prejudice is an abuse of discretion. *Zucco Partners, LLC v. Digimarc

Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

### B.   District courts must apply the Prison Litigation Reform Act screening standard cautiously to avoid preventing access to the courts.

Congress passed the Prison Litigation Reform Act (PLRA), 42

U.S.C. § 1997e, to "prevent sportive filings in federal court." *Skinner v.

Switzer,* 562 U.S. 521, 535 (2011); *see Williams v. Paramo,* 775 F.3d

1182, 1185 (9th Cir. 2015) ("Congress enacted the PLRA in an effort to

curb the large number of prisoner lawsuits filed in federal court.").

31

The PLRA does so by placing "a series of controls" on lawsuits filed by prisoners. *Skinner*, 562 U.S. at 535.

One such control requires district courts to review prisoner complaints, either when the complaint is docketed or as soon as practicable, and dismiss the complaint if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). Under the statute's three-strikes provision, a prisoner with three or more complaints dismissed under § 1915A is barred from bringing any additional civil actions in forma pauperis unless "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

Originally, before Congress enacted the PLRA, district courts could screen out only frivolous complaints. *See* 28 U.S.C. § 1915(d) (1996) (providing that cases could be dismissed sua sponte for being frivolous or malicious); *see Neitzke v. Williams*, 490 U.S. 319, 329–30 (1989) (holding a claim is not "frivolous" under § 1915(d) "because it fails to state a claim"), *superseded by statute on another ground*, PLRA, Pub. L. No. 104-134, § 804(a)(5), 110 Stat. 1321, 1321-74 (codified as amended at 28 U.S.C. § 1915(e)(2)), *abrogated on another ground by Bell*, 550 U.S. at 563. But in 1996, Congress amended the statute to allow district courts

to screen complaints that merely fail to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also* 28 U.S.C. § 1915A(b)(1) (requiring sua sponte dismissal of pro se prisoners' suits when they fail to state a claim). With that change, Congress removed important procedural protections from pro se plaintiffs and introduced the potential for district courts to too easily expel meritorious suits from their dockets before a complaint is even served. Even so, the PLRA was intended not "to prevent inmates from raising legitimate claims," but to prevent them "from abusing the Federal judicial system" while proceeding in forma pauperis. 141 Cong. Rec. 14,627 (1995) (statement of Sen. Orrin Hatch);

As the Supreme Court explained in a decision that predated the 1996 change, sua sponte dismissals for failure to state a claim remove important protections provided by adversarial briefing—particularly harming pro se plaintiffs, who can rarely draft "legally competent" complaints without counsel. *Neitzke*, 490 U.S. at 329–30. To ameliorate these constitutional concerns, the PLRA should be narrowly construed to allow sua sponte dismissal only when a claim is foreclosed by clearly established, factually on-point law. Unless presented with such a claim, district courts should allow the adversarial process to play out.

These concerns with § 1915A screening are much like those this Court has expressed about pre-filing orders against vexatious litigants under 28 U.S.C. § 1651(a). This Court has said such orders are an "extreme remedy that should rarely be used." *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007). The Court has thus explained that district courts "should not enter pre-filing orders with undue haste because such sanctions can tread on a litigant's due process right of access to the courts." *Id.* Rather, such orders should be entered "only after a cautious review of the pertinent circumstances." *Id.*

So too with PLRA screening orders. Because such orders tread on a litigant's right of access to the courts without the benefit of any adversarial briefing, district courts should carefully review pro se complaints for any potentially viable claims and use the screening process to dispose of only the most unmeritorious suits.

## C.   Long stated a valid injunctive relief claim on the face of his complaint.

To state a valid claim for injunctive relief under § 1983 against defendants named in their official capacity, a plaintiff must allege an ongoing violation of federal law. *Doe v. Lawrence Livermore Nat'l Lab.*,

131 F.3d 836, 840 (9th Cir. 1997). If a plaintiff raises a "colorable claim that the exercise of his religious beliefs has been infringed" by a policy or procedure, he has "sufficiently established that he will suffer an irreparable injury absent an injunction" barring enforcement of the relevant policy against him. *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005).

The district court erred when it dismissed Long's injunctive relief claim without leave to amend, incorrectly concluding that the constitutional violations Long alleged "began and ended" before he filed his complaint (1-ER-7). Long's complaint requested that the staff at Halawa reassess their policies and procedures for Ramadan meals and religious services, and implement adequate training to respect the inmates' religious rights. (2-ER-105.)

Construing Long's injunctive relief claim liberally, as required for pro se prisoners, he sufficiently stated a valid claim for injunctive relief because he alleged the Defendants instituted policies or procedures that created an ongoing risk of his religious rights being violated. *See Lawrence Livermore Nat'l Lab.*, 131 F.3d at 840. Although he specified a particular span of time in the past in which these violations were acute,

35

his complaint can be fairly read to also allege that he continued to be at ongoing risk of additional violations because of the policies and procedures implemented by Defendants. Specifically, Long alleged that Sugai adopted "policies [and] procedures" that gave preference to certain religions over others (2-ER-93); Sugai served Long, a Muslim, pork in violation of religious diet protocols (2-ER-98); the prison did not allow Long to attend Islamic services while allowing prisoners of different faiths to attend similar services (2-ER-99); and the prison served cold food that sat out for hours to Muslim prisoners during Ramadan, while prisoners of different faiths received different treatment (2-ER-100). Long has alleged colorable claims of ongoing unconstitutional policies and practices that put Long at continued risk of having his Free Exercise rights violated.[4] Because Long raised a

---

[4] It is irrelevant that between the beginning of his incarceration and the trial, he was temporarily transferred to Arizona. (*See* 2-ER-160.) The face of the complaint reflects that Long had in fact moved back to Halawa at the time he filed his lawsuit, so when the court dismissed his injunctive relief claim, he was still subject to the same allegedly unconstitutional policies and procedures he detailed in his complaint. (*See* 2-ER-91, 106.) Even if he had still been in Arizona, transfer to another facility does not moot a claim for injunctive relief unless there is "no reasonable expectation" that the plaintiff will return to the original prison. *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991).

colorable claim that the exercise of his Islamic beliefs had been infringed by Halawa's policies, he has sufficiently established that he will suffer irreparable injury without an injunction barring Halawa's unconstitutional policies. *See Warsoldier*, 418 F.3d at 1002.

### D. Even if Long's complaint did not state a claim for injunctive relief, the district court should have granted leave to amend.

"It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). Denying leave to amend is an abuse of discretion unless the complaint, construed liberally, could not have been saved by amendment. *See Lopez*, 203 F.3d at 1130; *see also Blaisdell*, 729 F.3d at 1241 (noting the Court's obligation to liberally construe pro se complaints, "especially when they are civil rights claims by inmates").

As described above, Long's complaint can be fairly read to state a valid claim for injunctive relief because he alleged policies and procedures that put him at risk for ongoing and future violations of his constitutional rights. But even if the face of his original complaint did

not make that allegation clear, he should have been given the opportunity to amend and make those allegations explicit.

If given the opportunity to amend, Long would have been able to allege that he was subject to policies and procedures creating ongoing constitutional violations at Halawa. This Court should reverse the district court's dismissal of the injunctive relief claim.

## II. The district court improperly dismissed Long's First Amendment claims against Antonio and Lee at summary judgment.

### A. A court must reverse summary judgment when, viewing the record in the light most favorable to the nonmoving party, there is a triable issue of material fact.

The Ninth Circuit reviews de novo a district court's grant of summary judgment. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014). This Court must consider the evidence in the light most favorable to Long, the nonmoving party. *Id.* And because Long was pro se in the proceedings below, this Court must consider as evidence all of Long's contentions, including all reasonable inferences to be made from that evidence. *Jones v. Blanas*, 393 F.3d 918, 922–23 (9th Cir. 2004), *rev'd on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). Finally, since Long is a pro se prisoner bringing a civil rights claim, this

Court has "an obligation to give a liberal construction" to Long's filings.

*Blaisdell*, 729 F.3d at 1241.

> **B.    On Long's First Amendment retaliation claim against Antonio, Long presented evidence showing genuine issues of material fact as to whether Antonio moved Long to the high-security facility to retaliate against Long for filing grievances.**

> > **1.    The district court properly found Long met the first four elements of a retaliation claim.**

To establish a viable claim of First Amendment retaliation against Antonio, Long must meet five elements: (1) Antonio took an adverse action against Long (2) "because of" (3) Long's protected conduct, (4) which chilled the exercise of Long's First Amendment rights, and (5) "did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

The district court ruled that Long satisfied the first four elements. (1-ER-47–49.) That ruling was correct, as we now briefly explain.

On the first element, the court clearly found Long engaged in protected conduct. This Court has long recognized "[p]risoners have a First Amendment right to file grievances against prison officials and to be free from retaliation." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).

On the second element, a transfer to the high-security facility was an adverse action. Prison officials "cannot transfer a prisoner" as punishment "for exercising his First Amendment right[s]." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). Even a threat to transfer an inmate can be an adverse action. *See Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009). And once Antonio transferred Long to the high-security facility, his quality of life greatly diminished, having reduced access to the telephone, completely losing access to the commissary, microwave, law library, and most importantly, Jumu'ah prayer services on Friday afternoons. (2-ER-141–42, 159.)

On the third element, viewing the evidence and drawing inferences in the light most favorable to Long, there is evidence that Antonio acted with a retaliatory motive. Antonio moved Long three days after he filed a final-step grievance against Sugai. This suspect timing is "circumstantial evidence of retaliatory intent." *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) (citation omitted). And Antonio admitted he moved Long *because of* his grievances. (*See* 2-ER-119–20 ("[Long]'s transfer was not in retaliation for his grievances but in recognition of them.").) Suspect timing and Antonio's own admission

40

presented a genuine issue of material fact as to whether Antonio moved Long in retaliation for filing grievances.

On the fourth element, Long's move to the high-security facility resulted in harm sufficient to chill the exercise of Long's First Amendment right to file grievances. Long only needed to allege a harm "that is 'more than minimal'" to meet this element. *Watison*, 668 F.3d at 1114 (quoting *Rhodes*, 408 F.3d at 568 n.11). Long had diminished or no access to the phone, law library, microwave, commissary, and Jumu'ah prayer services. In addition, he went from general population in a medium-security facility to a high-security facility alongside inmates who were there for "disciplinary reasons." (2-ER-160.) As the district court correctly recognized, Long's new restricted lifestyle and housing with problematic inmates was more than a minimal harm sufficient to satisfy this element.

> **2. The district court erred in finding there was no triable issue of fact on the fifth element—whether Antonio's decision to transfer Long reasonably advanced a legitimate correctional goal.**

As noted, the fifth element of a prisoner retaliation claim is whether the defendant acted in "the absence of legitimate correctional

goals." *Bruce*, 351 F.3d at 1289. Prison officials cannot claim an action served a valid penological purpose if it is used "as a cover or a ruse to silence and punish" an inmate for filing grievances. *Id.* In addition, this Court has repeatedly held that when there is a genuine issue of material fact regarding retaliatory motive, a one-sided justification for an official's actions cannot defeat summary judgment. *See Johnson v. Ryan*, 55 F.4th 1167, 1202 (9th Cir. 2022) ("[T]he presence of a genuine dispute of material fact with respect to a retaliatory motive means that Defendants' general justification for the action is not sufficient to defeat summary judgment."); *Watison*, 668 F.3d at 1116 (holding plaintiff's retaliation claim withstood summary judgment because plaintiff alleged "[the defendant's] conduct was retaliatory"); *Bruce*, 351 F.3d at 1289 ("Prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was [retaliatory].").

The district court erred in finding there was no disputed issue of fact as to whether Antonio's acts were solely for the purpose of advancing a legitimate correctional goal. First, the district court failed

to view the evidence—including reasonable inferences—in the light most favorable to Long. The court found Antonio transferred Long to promote order and safety, and to reduce conflict between Long and Sugai. But in reaching that conclusion, the court made an implied finding that Antonio's stated justification for the move was credible, and weighed his testimony against the suspect circumstantial timing and Long's contention that the stated justification was pretextual. Crediting Defendants' evidence while discounting Long's, and refusing to draw inferences in Long's favor, was inappropriate on summary judgment. *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) ("Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations.").

Suspect timing alone is circumstantial evidence of retaliation and suggests Antonio punished Long for filing a grievance. *See Bruce*, 351 F.3d at 1288. And any effort to use general procedures to punish Long for his grievances is not a reasonable advancement of Antonio's seemingly legitimate penological goals of maintaining order and safety. *See Johnson*, 55 F.4th at 1202 (holding the use of a procedure as a

43

pretext to punish an inmate for filing lawsuits did not reasonably advance a legitimate correctional goal).

In addition to the suspicious timing, Long provided declarations of other inmates who worked under Sugai that described him as "a bully that runs the kitchen through intimidation and threats." (2-ER-164; *see also* 2-ER-167 ("[Sugai] used threats and intimidation to control situations."), 173 (inmate describing how Sugai "harassed me every[ ]time he saw me" and was simply "not pro[f]essional").) In light of these declarations, a reasonable factfinder could have found Antonio's general justification to promote safety and order to be a pretext or an effort to protect a problematic corrections official, rather than to advance a legitimate correctional goal.

This case is strikingly similar to *Shephard v. Quillen*, 840 F.3d 686 (9th Cir. 2016). In *Shephard*, officials placed an inmate in administrative segregation the same day he complained of an officer assaulting him. *Id.* at 688. Officials claimed the transfer was pursuant to policy requiring an inmate's removal upon making a complaint to prevent interference in a future investigation, but also wrote on an administrative form they moved him for disciplinary reasons because he

was a security threat. *Id.* at 690. The *Shephard* court found there was a triable issue regarding retaliatory animus given the suspect timing and officials citing the grievances as a reason for the transfer, reversing summary judgment. *Id.* at 690–91. The Court then found a triable issue about whether the move advanced legitimate correctional goals because officials only provided a general justification, there was potential retaliatory animus, no evidence showed the inmate could taint an investigation into the officer's assault, and the administrative form's explanation undermined the general justification offered. *Id.* at 690–92.

Like in *Shephard*, there are inconsistencies regarding Antonio's decision to transfer Long, supporting an inference that the move was not to further legitimate penological goals but instead to retaliate against Long. First, nothing in the summary judgment record suggested Long posed a threat to security or order; there is no evidence any official ever wrote up Long for being dangerous or disorderly. Even though Sugai had informally "disciplined [Long] for his behaviors at meals" by expelling him from the dining hall in the modified MTM program (2-ER-119; *see* 2-ER-157), no official found his conduct serious enough to warrant any formal disciplinary action. And secondly, the evidence

viewed in the light most favorable to Long showed that it was Sugai, not Long, who was escalating conflicts. Sugai berated and harassed Long on numerous occasions, and inmates working for Sugai in the kitchen described him as threatening and a bully. (*See, e.g.*, 2-ER-154, 164.) A reasonable juror could find Antonio did not really view Long as a threat, and that he should have removed Sugai, not Long, because Sugai was at fault for the deteriorating relationship. And like in *Shepard*, Antonio specifically cited the grievances as the reason for Long's transfer. Given the suspect timing showing potential retaliatory animus, and Antonio's inconsistencies, lack of evidence, and citing of Long's grievances, this Court should find a triable issue of fact as to whether Antonio's transfer of Long furthered a legitimate correctional goal.

Given this Court's repeated emphasis that providing a generic justification cannot defeat summary judgment when there is a genuine issue of material fact regarding retaliatory motive, and this case's similarities to *Shepard*, this Court should reverse the district court's granting of summary judgment on Long's retaliation claim against Antonio.

46

**C.    The district court improperly granted summary judgment on Long's Free Exercise claim against Lee.**

**1.    The district court applied the wrong standard and incorrectly held there was no genuine issue of material fact that Lee substantially burdened Long's religious practice.**

To prevail on a Free Exercise claim, Long must show Lee substantially burdened his religious exercise and Lee's conduct was not "reasonably related to legitimate penological interests." *Shakur*, 514 F.3d at 884, 888. A substantial burden does not require Long to show he changed his behavior; a substantial burden exists if Lee denied Long an important benefit because of his religious practice that "tend[ed] to coerce" or "exert[ed] substantial pressure" on Long to violate his religious beliefs. *Jones v. Williams*, 791 F.3d 1023, 1031–32 (9th Cir. 2015); *see Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981).

In *May v. Baldwin*, 109 F.3d 557, 559–60, 563 (9th Cir. 1997), this Court assumed requiring a Rastafarian inmate to undo his dreadlocks in contravention of his religious beliefs or be placed in administrative segregation and forgo medical appointments placed a substantial burden on the inmate's religious exercise. In *Warsoldier*, 418 F.3d at

47

991–92, Warsoldier's religion required him to refrain from cutting his hair unless a close relative died, but the prison's policy required inmates to have their hair trimmed to three inches or less. The Court held that punishing and coercing Warsoldier to "acquiesce with the grooming policy" imposed a substantial burden on his religious practice. *Id.* at 996. The district court failed to apply the substantial burden analysis when deciding Long's claim. The court summarily concluded that serving a prisoner cold food is not a constitutional violation.[5] (1-ER-34; *see* 2-ER-100.) The court cited *LeMaire*, 12 F.3d at 1456, which held that occasionally serving cold food does not violate the Eighth Amendment's prohibition on cruel and unusual punishment; it did not address whether it substantially burdened plaintiff's religious practice.

Under the correct substantial burden analysis, there is a genuine issue of material fact. Lee, over the course of thirty days, served Long

---

[5] In addition, the district court stated Long "ha[d] not pointed to any adverse consequences, to his health or otherwise, stemming from being served cold food." (1-ER-34.) But in his complaint, Long specifically noted that being forced to eat cold food made his stomach ulcers worse. (2-ER-100.)

hot meals at 3:30 p.m., forcing Long to either eat the food then and break his Ramadan fast, or wait until 7:30 p.m. And after about four hours, Long would not have to just eat cold food, he would have to eat food that had sat out for so long it violated the prison's food temperature policy and had become "harden[e]d" and congealed to the point of being inedible. (2-ER-100–01.) Long often was forced to throw the food away rather than risk eating the potentially spoiled food.

A reasonable juror could find that Lee, in not allowing Long to use a microwave and failing to contact the kitchen to ensure Long was served fresh food,[6] put "substantial pressure" on Long to eat before dusk and violate his Ramadan fast. (*See* 2-ER-100; 3-ER-397–98.) Forcing Long to either eat hot food at 3:30 p.m. and violate his religious beliefs, or eat cold, congealed, and inedible food at 7:30 p.m., which exacerbated his stomach ulcers, tended to coerce Long into breaking his Ramadan fast. It does not matter whether Long actually decided to break fast; a violation of Long's rights still occurred when Lee denied

---

[6] If the claim had gone to trial, Long would have shown Halawa's Ramadan policy was to deliver food in a hotbox, which kept food at an appropriate temperature until after sunset. (3-ER-397–98.)

him an important benefit because of his fasting—warm food that complies with the prison's health and safety standards—"thereby putting substantial pressure on [Long] to modify his behavior and to violate his beliefs." *Warsoldier*, 418 F.3d at 995. And like in *May*, where officials denied an inmate medical attention and put his health and safety in jeopardy for adhering to his beliefs, Lee forced Long to eat cold and potentially unsafe food and put his health in jeopardy for adhering to his Ramadan fast. And, like in *Warsoldier*, where officials burdened Warsoldier's beliefs by forcing him to choose between either growing out his hair and being punished or "acquiesc[ing]" to the prison's standard short hair policy, Lee substantially burdened Long's ability to observe Ramadan when he forced Long to either break his fast, eat warm food, and acquiesce to the standard meal time, or wait several hours and eat cold, inedible food.

### 2. Long presented evidence that Lee's refusal to provide him with hot food during Ramadan did not serve any legitimate correctional goal.

Not only did Lee's conduct impose a substantial burden, his conduct was not reasonably related to legitimate correctional goals, which the district court did not discuss after it improperly applied an

Eighth Amendment, not a substantial burden, analysis. To decide whether an official's actions are reasonably related to legitimate penological interests, this Court applies the *Turner* factors. *Shakur*, 514 F.3d at 884 (citing *Turner v. Safely*, 482 U.S. 78, 89–90 (1987); *see Turner*, 482 U.S. at 89–90, *superseded in part by statute*, Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274, 114 Stat. 803, *as recognized in Warsoldier*, 418 F.3d at 994). The court must weigh whether there are any (1) "valid, rational connection[s]" between the official's conduct and proffered justification; (2) "alternative means" for Long to exercise the right; (3) impacts on prison resources in accommodating Long; and (4) obvious, easy alternatives. *Shakur*, 514 F.3d at 884. Here, there are triable issues of fact regarding each factor.

As to the first *Turner* factor, a reasonable juror could find there was no valid connection between Lee's conduct and his asserted justification. Lee claimed refusing to let Long use the microwave avoided any shows of favoritism, "reduce[d] [future] liability to the facility," and prevented any complaints of officials tampering with an inmate's food. (2-ER-123.) These are general penological interests offered in the abstract, but a reasonable juror could have also concluded

these justifications were pretextual. Lee refused to call the kitchen, locate a hot box, find appropriate adjustments, or make any other efforts over the course of thirty days to ensure Long received hot and, more importantly, safe food when he broke fast. There is no valid rational connection between Lee's conduct—taking no action over a month to ensure Long's food was safe to eat—and the interests proffered. Also, a reasonable juror could have found that ensuring Long received hot meals would not create any appearance of favoritism; Lee would simply be finding a way to follow prison food handling policy. And Lee's refusal to ensure Long had hot food only increased the potential for liability and grievances, as evidenced by this very lawsuit. A reasonable juror could find the proffered justifications were a pretext to punish Long, given Lee's actions are in direct tension with his stated penological interests.

When there is a triable issue regarding a valid connection, the court "need not address the remaining *Turner* factors" and should reverse the grant of summary judgment. *Jones v. Slade*, 23 F.4th 1124, 1139 (9th Cir. 2022). But even if this Court examines the other three *Turner* factors, there are triable issues on those factors as well.

Regarding the second *Turner* factor, a reasonable factfinder could find Long had no alternative means to fast for Ramadan. This Court has found that when the religious practice is a "strict religious prohibition about the sanctity and purity of the body," such as forcing "an Orthodox Jew to eat non-Kosher food," the second *Turner* factor should weigh in favor of the inmate. *Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir. 2004). Like in *Henderson*, where forcing a Jewish inmate to eat non-Kosher food violated the "sanctity and purity of [his] body," pressuring Long to break his Ramadan fast would similarly force him to defile the sanctity of his body and violate a strict religious prohibition on eating before sunset. And unlike in *Shakur*, 514 F.3d at 886, where this Court found an inmate had alternative means to practice his religion when he could observe Ramadan; keep a Quran, prayer mat, and seven religious items in his cell; and meet with an Imam upon request, Long did not have access to an Imam or Jumu'ah prayer services in the high-security facility, and was prohibited from participating in Ramadan celebrations.

As to the third *Turner* factor, providing Long with warm food would impose a negligible burden on staff, other inmates, and prison

resources. In terms of showing Long favoritism and creating the potential burden of a hostile prison environment, this Court has typically "discounted the favoritism argument" and found it not dispositive when weighing this factor because it is always present when an inmate requires special accommodations. *Shakur*, 514 F.3d at 886; *see Ward*, 1 F.3d at 878. Conclusory statements about disruptions or expenses, without evidence, are insufficient to weigh this factor for appellees. *See Ward*, 1 F.3d at 878–79. Here, the governmental interest in preventing favoritism is not dispositive, and there was no evidence of any increased financial costs on the prison. And like in *Ward*, 1 F.3d at 878–79, where the court could not accept the prison official's conclusory assertion that accommodating an inmate's diet would pose a significant burden without the district court making factual findings to that effect, this Court cannot accept any argument that providing Long hot food would pose a burden because the district court made no factual findings to support that assertion.

For the last *Turner* factor, there are easy alternatives to denying Long warm and safe food. Lee could have taken his food to an available microwave, asked the kitchen to prepare a separate meal for a single

month of the year, or locate the hot box that was outlined in the prison's own policy. Viewing the evidence in the light most favorable to Long, there are triable issues of fact as to whether the cost to prison officials for following their own prison's food safety and Ramadan policies would have been too burdensome.

Because there were triable issues of fact for all elements of Long's Free Exercise claim against Lee, this Court should reverse the district court's grant of summary judgment.

## III. On the claims that went to trial, the district court made key factual findings that were unsupported by the evidence.

### A. The district court drew an illogical and impermissible inference that Long was a significant threat to prison security.

#### 1. This Court must find clear error in a lower court's unsupported and implausible factual finding.

The Ninth Circuit reviews a district court's findings of facts for clear error. Fed. R. Civ. P. 52(a)(6); *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010). "A finding is clearly erroneous if it is illogical, implausible, or without support in the record." *Graf*, 610 F.3d at 1157.

55

**2.    The district court's unsupported factual conclusion that Long posed a significant security threat led to the dismissal of all his claims.**

The district court conducted a trial on Long's Free Exercise claims against Sugai and Antonio, and his retaliation claim against Sugai.

A Free Exercise claim will succeed if the plaintiff demonstrates: (1) the defendant substantially burdened the practice of the inmate's religion; and (2) the defendant did so without any justification reasonably related to legitimate penological interests. *See Shakur*, 514 F.3d at 884. Under the second element of a Free Exercise claim, courts measure whether the burden imposed on the plaintiff was related to a legitimate penological interest by analyzing the *Turner* factors: "(1) Whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'; (2) whether there are 'alternative means of exercising the right that remain open to prison inmates'; (3) whether 'accommodation of the asserted constitutional right' will 'impact . . . guards and other inmates, and on the allocation of prison resources generally'; and (4) whether there is an 'absence of ready alternatives' versus the 'existence

56

of obvious, easy alternatives.'" *Shakur*, 514 F.3d at 884 (quoting *Turner*, 482 U.S. at 89–90).

A retaliation claim will succeed if the plaintiff demonstrates: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567–68 (footnote omitted).

The trial court made a factual finding that Long was a threat to prison security. Based on that unsupported finding, the court ruled against Long on all three claims that went to trial, because the court reasoned that this threat meant Defendants' actions were connected to a legitimate penological interest. (1-ER-77–78, 81–82, 87.)

On Long's Free Exercise claim against Sugai, the district court concluded under the first *Turner* factor that moving Long back to his cell was rationally connected with security—the "paramount concern" in a prison environment. (1-ER-77.) The third *Turner* factor was similarly supported by the court's conclusion that Long was being "argumentative and disruptive with the kitchen staff," which caused a "significant

threat of escalatory behavior that needed immediate attention." (1-ER-78.)

On Long's Free Exercise claim against Antonio, the court cited Hawaii's Department of Public Safety Corrections Administration Policy and Procedures Manual, which mandates that inmates may be separated from the general population temporarily if they pose an "'immediate threat to the safety of self or others'" or if an inmate "'endangers institutional security.'" (1-ER-81.) The court found the third factor weighed "strongly in favor" of Antonio because the court concluded if Antonio were to leave Long at the medium-security facility, there would have been a "significant impact on institutional security" at the facility. (1-ER-82.)

Similarly, on Long's retaliation claim against Sugai, the court cited to its previous conclusion that Sugai's actions were related to a legitimate correctional goal, which, as discussed above, was based on the conclusion that Long was a threat to security. (1-ER-87.)

Thus, for each of Long's claims at trial, the court resolved those claims based on the idea that Long posed a "significant threat" to institutional security at the medium-security facility. The court

58

concluded that it was not the court's duty to "second-guess Sgt. Sugai's judgment as to the severity of and remedies to those altercations," which led Sugai to send Long back to eat alone in his cell. (1-ER-78–79.)

### 3. The evidence presented at trial did not support the factual finding that Long posed a security threat.

Throughout the entirety of the trial, the only testimony as to Long's behavior being disruptive on any level occurred when Sugai was asked whether Long had ever been "disrespect[ful] [or] disruptive" when he came to get his meals, and Sugai answered that he "[m]ore often" recalled Long being "argumentative, arguing or debating [his] dislikes with the food service staff." (3-ER-335–36.) Notably, Sugai never actually used the word "disruptive" to describe Long's behavior. Sugai only testified that *if* an inmate were "argumentative or disruptive," they would get their food in their cell rather than in the dining hall with the rest of the inmates. (3-ER-335.) Thus, the only adjective used to describe Long's behavior at the medium-security facility was "argumentative." The court stretched this testimony past a reasonable inference to mean that Long posed a "significant" security risk to himself and other inmates. (1-ER-78, 82.) Sugai never wrote Long up for

any threatening behavior (3-ER-336), and the Defendants presented no evidence that Long was ever written up by any official. If Long were such a significant threat to institutional security that warranted transfer to a different facility altogether, one would assume he would have been written up at least once.

Furthermore, Long was justified in "arguing" and "debating" over his meals to food service staff: he had requested to be on the non-pork diet list at least three times, yet continuously received pork meals. (*See* 2-ER-146, 148, 149; *see also* 2-ER-98, 107, 150.) This behavior, debating the status of dietary restriction meals, does not translate to being a "significant threat" to prison security. *See Jones*, 791 F.3d at 1036 ("A prisoner's 'impolitic choice of words' does not categorically justify punitive action by prison officials." (quoting *Bradley v. Hall*, 64 F.3d 1276, 1281 (9th Cir. 1995))). Although the court noted it would not "second-guess" Sugai's judgment as to the severity of Long's "altercations," Sugai never testified there ever *was* an altercation, much less one that severely escalated.

Notably, Sugai testified that it was a rarity to send inmates back to their cells to eat; in Sugai's ten years of working at the prison, he had

only done so "[f]ive or less" times. (3-ER-319–20.) Sugai proceeded to

testify that he had sent Long back to his cell to eat "maybe three" times.

(3-ER-324.) So in his ten years of working at the prison, where sending

inmates back to their cells to eat was a "rarity," more than half of those

times involved Long. And yet, there is no evidence any official ever

wrote up Long.

There is no legitimate penological interest in making an inmate

return to their cell to eat, or transferring them to a higher-security

facility, simply because they complain that their meal violates their

religious dietary needs. In *Schroeder*, 55 F.3d at 461, the court found

prison officials had a legitimate penological interest in transferring

plaintiff to a higher security facility because the plaintiff was

"disrupting internal discipline" (by committing seven rule violations in

his first sixteen days at the minimum security facility) as well as

"disrupting internal order" (by posing as a security threat through the

use of force or threat of force against the officials and submitting too

many requests to access the law library). Unlike *Schroeder*, there is no

evidence Long used or threatened force, committed a rule violation, or

was ever written up so as to justify transferring him to a higher

security facility. This Court's precedent does not indicate any connection between an "argumentative" inmate and a legitimate penological interest in the type of discipline imposed here.

At bottom, there was no evidence at trial that Long posed any threat at all, much less a "significant" one. The only evidence presented that would seemingly support this inference is that he filed a grievance about his non-halal meals and was "argumentative" with kitchen staff when he received non-conforming meals. The court seemingly expanded upon the testimony to unreasonably conclude that Long was a significant threat to Halawa security. Based on this unsupported finding, the court weighed the first and third *Turner* factors against Long, and rejected all three of Long's claims. This Court should remand all three of Long's claims back to the district court in a new trial to rebalance the *Turner* factors without injecting the unsupported finding that Long posed a security threat.

**B.      No evidence supported the court's denial of Long's Free Exercise claim against Antonio on the ground that transporting Long required increased "personnel commitments."**

In deciding Long's Free Exercise claim against Antonio, the district court applied the four *Turner* factors to decide whether Antonio

had a legitimate penological interest in transferring Long to the high-security facility. (1-ER-81.) The court weighed the first *Turner* factor, regarding a rational connection between the action and a legitimate government interest, and third *Turner* factor, whether the accommodation of the constitutional right would impact guards, inmates, or the prison generally, in favor of Defendants, based on the unsupported notion that Long was a security threat, as discussed above. The district court correctly weighed the second *Turner* factor, regarding whether Long had alternative means of attending Jumu'ah services, in favor of Long. The fourth *Turner* factor, whether there were any obvious and easy alternatives, should have been weighed in favor of Long on his Free Exercise claim against Antonio because there was a readily available alternative. However, the district court incorrectly weighed this fourth *Turner* factor against Long because it made the impermissible and unreasonable inference from testimony at trial that it would take additional resources to transfer Long to attend Jumu'ah prayer services.

Under the fourth *Turner* factor, courts consider "[w]hether there is an 'absence of ready alternatives' versus the 'existence of obvious, easy

alternatives.'" *Shakur*, 514 F.3d at 884 (quoting *Turner*, 482 U.S. at 89–90). The district court concluded there was "no ready alternative to transferring Plaintiff to high-security." (1-ER-83.) The court elaborated that it would not be practical to transport Long to the medium-security facility on Fridays to attend Jumu'ah prayer services at noon given the "required personnel commitments." (1-ER-83.)

But the evidence presented at trial did not support this conclusion. Antonio testified that transport between the medium-security facility and high-security facility ran daily from 6:00 a.m. to 6:00 p.m. (3-ER-271.) Defendants' counsel then asked if it would take additional marshaling of resources to move an inmate between facilities, and Antonio clarified that it would take additional officers from other posts "*outside of that time*," meaning outside of 6:00 a.m. to 6:00 p.m. (3-ER-272 (emphasis added).) Antonio testified that inmates are moved between the facility only for medical reasons (3-ER-271), verifying that transfers are made when necessary, just not for religious reasons.

The testimony at trial regarding transportation never established that any additional resources would be needed to transfer Long to the

medium-security facility for Friday Jumu'ah services, which are held from noon to 1:00 p.m. (2-ER-99.) Between 6:00 a.m. and 6:00 p.m., the vast majority of daylight hours and during the time when Long needed to attend prayer services, transport services were already running between the two facilities. The fact that there were already running transports does not lead to a reasonable inference that there was an "absence of ready alternatives." *Shakur*, 514 F.3d at 884. Rather, it leads to the opposite conclusion: the availability of already-running transports provides an "obvious, easy alternative." *Id.* Halawa already had resources available to transfer Long to and from midday Jumu'ah prayer at the medium-security facility.

Thus, if the court had not made unreasonable inferences, it should have weighed all four *Turner* factors in favor of Long on his Free Exercise claim against Antonio for the transfer to the high-security facility. This Court should remand the Free Exercise claim against Antonio for the district court to rebalance the *Turner* factors, since without the impermissible inferences drawn by the district court, all four factors should have weighed in favor of Long.

65

## CONCLUSION

For these reasons, this Court should reverse and remand for further proceedings.

April 21, 2023

**HORVITZ & LEVY LLP**
  CURT CUTTING
  REBECCA G. POWELL
**PEPPERDINE CARUSO SCHOOL OF LAW**
**NINTH CIRCUIT APPELLATE**
**ADVOCACY CLINIC**
  MAXWELL LYSTER (Certified Law Student)
  MACY MERRITT (Certified Law Student)

By:  s/ Curt Cutting

Attorneys for Plaintiff-Appellant
**DE WITT LAMAR LONG**

## STATEMENT OF RELATED CASES

Appellant knows of no cases requiring disclosure under 9th Cir. R. 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15997

I am the attorney or self-represented party.

**This brief contains** | 12,917 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Curt Cutting | **Date** | April 21, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*