# No. 22-15997

IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**DE WITT LAMAR LONG,**
*Plaintiff-Appellant,*

*v.*

**SGT. SUGAI et al.,**
*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF HAWAI'I
J. MICHAEL SEABRIGHT, DISTRICT JUDGE • CASE NO. 1:19-CV-00235-JMS-RT

---

## APPELLANT'S REPLY BRIEF

---

**HORVITZ & LEVY LLP**
CURT CUTTING
REBECCA G. POWELL
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800

**PEPPERDINE CARUSO SCHOOL OF LAW
NINTH CIRCUIT APPELLATE
ADVOCACY CLINIC**
MAXWELL LYSTER (CERTIFIED LAW STUDENT)
MACY MERRITT (CERTIFIED LAW STUDENT)
24255 PACIFIC COAST HIGHWAY
MALIBU, CALIFORNIA 90263-3999

ATTORNEYS FOR PLAINTIFF-APPELLANT
**DE WITT LAMAR LONG**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................ 4

I.   The district court erred in dismissing DeWitt Lamar Long's
     claims for injunctive relief at the screening stage .......................... 4

     A.   Long stated a valid injunctive relief claim on the face of
          his complaint. ......................................................... 4

     B.   Even if Long's complaint did not state a claim for
          injunctive relief, the district court should have granted
          leave to amend. ....................................................... 6

     C.   The district court's error in dismissing Long's
          injunctive relief claim was not harmless. .............................. 6

II.  The district court improperly dismissed Long's First
     Amendment claims against Lyle Antonio and Wyatt Lee at
     summary judgment. ......................................................... 9

     A.   A court must reverse summary judgment when,
          viewing the record in the light most favorable to the
          nonmoving party, there is a triable issue of material
          fact. .................................................................. 9

     B.   On Long's First Amendment retaliation claim against
          Antonio, Long presented evidence showing genuine
          issues of material fact as to whether Antonio moved
          Long to the high-security facility to retaliate against
          him for filing grievances. ............................................ 12

          1.   Defendants do not dispute that the district court
               properly found Long met the first three elements
               of a retaliation claim. .......................................... 12

2. The district court erred in finding there was no triable issue of fact on two of the elements—the retaliatory motive and the legitimate penological interests elements. ........................................................ 13

3. The error in dismissing Long's retaliation claim against Antonio was not harmless. ............................. 17

C. The district court improperly granted summary judgment on Long's Free Exercise claim against Lee. ......... 18

1. The district court applied the wrong standard and incorrectly held there was no genuine issue of material fact that Lee substantially burdened Long's religious practice. ............................... 18

2. Long presented evidence that Lee's refusal to provide him with hot food during Ramadan did not serve any legitimate correctional goal. .................. 22

3. Long did not waive the issue of whether Lee is entitled to qualified immunity. ..................................... 23

4. Qualified immunity is inapplicable because Long had a clearly established right to be free from pressure to abandon his religious beliefs and a proper religious diet. .................................................... 26

III. On the claims that went to trial, the district court made key factual findings that were unsupported by the evidence. ............. 28

A. The evidence presented at trial did not support the factual finding that Long posed a security threat. ............... 28

B. No evidence supported the court's denial of Long's Free Exercise claim against Antonio on the ground that transporting Long required increased "personnel commitments." ........................................................ 33

CONCLUSION ........................................................................ 36

CERTIFICATE OF COMPLIANCE FOR BRIEFS ................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albino v. Baca,*
  747 F.3d 1162 (9th Cir. 2014) ............................................................ 9

*Ashelman v. Wawrzaszek,*
  111 F.3d 674 (9th Cir. 1997) ............................................................ 27

*Blaisdell v. Frappiea,*
  729 F.3d 1237 (9th Cir. 2013) .......................................................... 10

*Bradley v. Hall,*
  64 F.3d 1276 (9th Cir. 1995) ............................................................ 32

*Bruce v. Ylst,*
  351 F.3d 1283 (9th Cir. 2003) .......................................................... 13

*Couch v. Jabe,*
  479 F.Supp.2d 569 (W.D. Va. 2006) ................................................ 22

*Crump v. Best,*
  No. 10-13787, 2012 WL 1056806 (E.D. Mich. Mar. 5, 2012) ............ 21

*Doe v. Lawrence Livermore Nat'l Lab'y,*
  131 F.3d 836 (9th Cir. 1997) .............................................................. 4

*Earp v. Ornoski,*
  431 F.3d 1158 (9th Cir. 2005) .......................................................... 10

*Green v. Tudor,*
  685 F.Supp.2d 678 (W.D. Mich. 2010) ............................................ 20

*Jaami v. Compton,*
  No. 98-5055, 1999 WL 455374 (6th Cir. June 23, 1999) .................. 20

*Johnson v. Ryan,*
  55 F.4th 1167 (9th Cir. 2022) .......................................................... 13

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) ............................................................ 10

*Jones v. Williams*,
   791 F.3d 1023 (9th Cir. 2015) .................................................... 27, 29

*Kisela v. Hughes*,
   138 S.Ct. 1148 (2018) ...................................................................... 27

*Kwanzaa v. Mee*,
   No. 09-5132, 2011 WL 2580396 (D.N.J. June 28, 2011) .............. 21, 22

*Laufgas v. Speziale*,
   263 F. App'x 192 (3d Cir. 2008) ........................................................ 19

*LeMaire v. Maass*,
   12 F.3d 1444 (9th Cir. 1993) ............................................................ 18

*McElyea v. Babbitt*,
   833 F.2d 196 (9th Cir. 1987) ............................................................ 27

*Morales v. Fry*,
   873 F.3d 817 (9th Cir. 2017) ............................................................ 25

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ............................................................ 6

*Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*,
   992 F.3d 893 (9th Cir. 2021) ............................................................ 11

*Pfingston v. Ronan Eng'g Co.*,
   284 F.3d 999 (9th Cir. 2002) ............................................................ 24

*Poindexter v. Lee*,
   No. 17CV00386, 2018 WL 3617890 (W.D. Va. July 30, 2018) ........... 19

*Pratt v. Rowland*,
   65 F.3d 802 (9th Cir. 1995) .............................................................. 10

*Rhodes v. Robinson*,
   408 F.3d 559 (9th Cir. 2005) ............................................................ 12

*Rice v. Morehouse,*
    989 F.3d 1112 (9th Cir. 2021) ........................................................... 26

*Ruffin v. Hinkley,*
    No. 17-cv-00151-NT, 2017 WL 3670659 (D. Me. Aug. 25, 2017) ....... 19

*Saddiq v. Trinity Services Group,*
    198 F.Supp.3d 1051 (D. Ariz. 2016) .................................................. 20

*Sawyer v. Jeffries,*
    315 F. App'x 31 (10th Cir. 2008) ....................................................... 19

*Shakur v. Schriro,*
    514 F.3d 878 (9th Cir. 2008) ...................................................... 28, 34

*Shepard v. Quillen,*
    840 F.3d 686 (9th Cir. 2016) ................................................. 14, 15, 16

*Singleton v. Wulff,*
    428 U.S. 106 (1976) .......................................................................... 24

*Soto v. Sweetman,*
    882 F.3d 865 (9th Cir. 2018) ............................................................ 11

*Stewart v. U.S. Bancorp,*
    297 F.3d 953 (9th Cir. 2002) .............................................................. 7

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ........................................................................... 7

*Tortu v. Las Vegas Metro. Police Dep't,*
    556 F.3d 1075 (9th Cir. 2009) .......................................................... 26

*Turner v. Safley,*
    482 U.S. 78 (1987) ............................................................................ 35

*United States v. Northrop Corp.,*
    59 F.3d 953 (9th Cir. 1995) .............................................................. 24

*United States v. Ullah,*
    976 F.2d 509 (9th Cir. 1992) ...................................................... 24, 25

*Ward v. Walsh,*
    1 F.3d 873 (9th Cir. 1993)...................................................27

*Warsoldier v. Woodford,*
    418 F.3d 989 (9th Cir. 2005)...........................................4, 28

## Constitutions

United States Constitution
    amend. I ..................................................................... *passim*
    amend. VIII...............................................2, 9, 18, 19, 23

## Statutes

42 U.S.C. § 2000cc-1 ...............................................................35

## Rules

Fed.R.App.P.2.........................................................................24

## Miscellaneous

Religious Land Use and Institutionalized Persons Act of
    2000, Pub. L. No. 106-274, § 3, 114 Stat. 803 .............................20, 35

# APPELLANT'S REPLY BRIEF

# INTRODUCTION

Appellant DeWitt Lamar Long has the constitutional right to a diet that comports with his religious beliefs while incarcerated. Yet at Halawa Correctional Facility ("Halawa"), Long was routinely denied meals he was constitutionally entitled to. When he asserted his rights, prison officials threatened, coerced, and retaliated against him. In their answering brief, Defendants ask this court to rubber-stamp the district court's rulings disposing of Long's claims, without offering any meaningful response to many of Long's arguments on appeal.

For example, Long argues that the district court erred by dismissing his injunctive relief claims at the screening stage without leave to amend. Defendants argue this ruling was correct because, they contend, Long's claims related only to Defendants' past misconduct, and therefore, Long had no right to prospective injunctive relief. Defendants' arguments ignore that Long alleged Defendants adopted and implemented improper policies and practices regarding religious meals at Halawa, and if granted leave to amend, he could have made those allegations clearer.

1

Long argues that the district court erred by granting summary judgment on Long's retaliation claim against Chief of Security Lyle Antonio because the court deferred to Antonio's testimony rather than drawing all reasonable inferences in favor of Long as the nonmoving party. Defendants' brief argues that courts should defer to the judgment of prison officials, but that argument fails to recognize that courts cannot resolve factual disputes at summary judgment.

Similarly, Defendants fail to confront Long's argument that the district court improperly granted summary judgment on his Free Exercise claim against Sergeant Wyatt Lee by treating it as an Eighth Amendment claim, instead of determining if a factual dispute existed about whether Lee's conduct substantially burdened Long's religious practice under the First Amendment. Defendants respond by citing more Eighth Amendment cases for the proposition that prisoners do not have a constitutional right to hot food. But that simply doubles down on the district court's error, and ignores the crux of Long's claim—that Lee substantially burdened Long's exercise of his religious beliefs by forcing Long to choose between breaking his fast and eating food that was

intended to be consumed hot, or waiting hours to eat after sundown when the food had become congealed and inedible.

Finally, Defendants identify no evidence to support the district court's factual findings at trial that Long posed a security threat, and that transferring Long to the medium-security facility for Jumu'ah prayer services would place an unreasonable burden on prison resources. Rather than point to evidence that could support those findings (there is none), Defendants pretend that those findings were never made.

This Court should reverse and remand for further proceedings, so that Long can proceed with the claims that were improperly dismissed and have a fair trial on the merits of his claims.

## ARGUMENT

I.    **The district court erred in dismissing DeWitt Lamar Long's claims for injunctive relief at the screening stage.**

A.    **Long stated a valid injunctive relief claim on the face of his complaint.**

To state a valid claim for injunctive relief, a plaintiff must allege an ongoing violation of law that "sufficiently establishe[s] he will suffer an irreparable injury absent an injunction." (AOB 34–35 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005)) (citing *Doe v. Lawrence Livermore Nat'l Lab'y*, 131 F.3d 836, 840 (9th Cir. 1997)).)

Long met that standard by pleading that Defendants instituted policies and procedures that created an ongoing, systematic risk of his religious rights being violated. (AOB 35.) Long requested that the staff at Halawa alter their policies and procedures for serving Ramadan meals and conducting religious services, as well as implement proper training on religious discrimination. (AOB 35.)

Defendants contend that the district court properly dismissed Long's injunctive relief claim at the screening stage because Long stated a specific timespan between February 4, 2016 and June 28, 2017 when violations of his constitutional rights were particularly acute. (AB

4

16–17.) Defendants contend that because these specifically described violations occurred in the past, Long had no right to prospective relief. (AB 15–16.)

Defendants' argument reads Long's complaint too narrowly, contrary to the liberal pleading standards for pro se prisoners. (AOB 30–31.) Long did not explicitly emphasize that—on top of the specific past violations—he continued to suffer violations of his constitutional rights at the time he filed his complaint. But he alleged that the problems were ongoing. He alleged that Sugai adopted "policies [and] procedures" at Halawa, giving unconstitutional preference to certain religions over others (2-ER-93), and he filed his complaint while incarcerated at Halawa (2-ER-91). These facts, along with his allegations about specific violations of his constitutional rights in the past, give rise to the reasonable inference that Long continued to be unconstitutionally constrained by the policies and procedures at Halawa.

Defendants further argue that Long could not proceed with an injunctive relief claim on behalf of others because he was not an adequate class representative. (AB 16–17.) That argument is misplaced

because Long never tried to bring a class action. Long sought injunctive relief for the violation of his own constitutional rights, not the rights of other prisoners.

### B. Even if Long's complaint did not state a claim for injunctive relief, the district court should have granted leave to amend.

At the very least, Long should have been given leave to amend his complaint to make his allegations of ongoing constitutional violations more clear. (AOB 37–38 ("[A] district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015))).) Long argued this point in his opening brief (AOB 37–38), and Defendants offer no response.

### C. The district court's error in dismissing Long's injunctive relief claim was not harmless.

Defendants contend that any error in dismissing Long's request for injunctive relief was harmless because Long filed another lawsuit. (AB 17–18.) That argument lacks merit because any plaintiff whose claim is dismissed at the screening stage may always attempt to file a new suit asserting their rights. But this argument ignores the fact that

6

res judicata bars a plaintiff from reasserting their previously dismissed claims. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (explaining the doctrine of claim preclusion bars successive litigation of the same claim after final judgment has been entered in a previous lawsuit); *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002) (noting "dismissal with prejudice" is interchangeable with "final judgment on the merits" for res judicata analysis). Defendants cannot cite any authority supporting the notion that the improper dismissal of a lawsuit is a harmless error because the plaintiff sued again.

Defendants also make a harmless error argument based on the trial testimony of Chaplain Alan Leigh, that Islamic services are available at Halawa generally. (AB 17–18.) Defendants contend that Leigh's testimony disproves Long's claim that Islamic services were unavailable to him after he complained about the denial of religious meals and was transferred to the high-security facility at Halawa. (AB 17–18.) Not so. Leigh's testimony that services were available at Halawa as a general matter is irrelevant; Long never claimed that he could not attend Jumu'ah services while he was housed in the medium-security portion of the facility. His claim was that he lost access to those

services after the retaliatory transfer to the high-security facility. (AOB 39–41.)

To the extent that Defendants rely on Leigh's testimony for the proposition that Long could still attend prayer services at the high-security facility, that position contradicts other statements in Defendants' own brief, the district court's findings, and Defendants' own trial testimony. (*See* AB 6 ("On May 8, 2017, Plaintiff was transferred from [medium facility] to [high facility]. As a result of the transfer, Plaintiff was unable to attend Friday Jumu'ah services because it was not being offered at [high facility]." (citation omitted)); *see also* 1-ER-83 (district court's finding of fact from trial that the prison would have to transport Long "from the high-security facility to the medium-security facility in order to attend Jumu'ah prayer services"); 3-ER-269–70 (Antonio's trial testimony explaining that the prison would not transfer Long back to the medium-security facility for Friday Jumu'ah services because it would require two officers and a transport van); 2-ER-117 (Defendants' motion for summary judgment explaining that prisoners are not allowed to return to the medium-security facility to participate in group activities including religious services).)

Finally, Defendants cite a string of nonprecedential, unpublished cases for the proposition that serving cold food to prisoners does not amount to a constitutional violation. (AB 18.) But Defendants, like the district court, miss the issue raised here, which is not whether serving cold food amounts to cruel and unusual punishment under the Eighth Amendment, but whether it substantially burdened Long's exercise of religion, which we will discuss in Part II.C.

## II. The district court improperly dismissed Long's First Amendment claims against Lyle Antonio and Wyatt Lee at summary judgment.

### A. A court must reverse summary judgment when, viewing the record in the light most favorable to the nonmoving party, there is a triable issue of material fact.

This Court reviews de novo a district court's grant of summary judgment, and must draw all reasonable inferences in favor of the nonmoving party. (AOB 38 (citing *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014)).) Defendants fundamentally distort this standard by arguing that the district court appropriately "accorded substantial deference to [Antonio's] judgment" and reasonably found that Antonio offered legitimate "penological reasons" for transferring Long. (AB 19–20.) Courts may not accord substantial deference to prison officials'

9

judgment at the summary judgment stage and may not weigh
credibility evidence. (AOB 43 ("Summary judgment is an inappropriate
vehicle for resolving claims that depend on credibility determinations."
(citing *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005))).) The
district court should have viewed the evidence in the light most
favorable to Long, drawn reasonable inferences in his favor, and
liberally construed his filings. (AOB 38–39 (first citing *Jones v. Blanas*,
393 F.3d 918, 922–23 (9th Cir. 2004); then citing *Blaisdell v. Frappiea*,
729 F.3d 1237, 1241 (9th Cir. 2013)).)

Defendants contend Long bears the burden of "pleading and
proving the absence of legitimate correctional goals for the conduct of
which he complains." (AB 19 (quoting *Pratt v. Rowland*, 65 F.3d 802,
806 (9th Cir. 1995)).) But *Pratt* involved a preliminary injunction, not
summary judgment. And a preliminary injunction requires a much
higher standard for the plaintiff to prevail. *See Pratt*, 65 F.3d at 805 ("A
preliminary injunction is appropriate if the moving party demonstrates
either (1) a probability of success on the merits and a possibility of
irreparable injury, or (2) serious questions going to the merits and the
balance of hardships tipping sharply in his favor.").

10

Defendants also assert that Long cannot create a genuine issue of material fact by "assertions alone" and must "submit some competent evidence" to defeat summary judgment. (AB 20 (first citing *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021); then citing *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018)).) Defendants quote a final conclusion from Long's brief in opposition to summary judgment, suggesting that he offered *only* that conclusion, while they omit any mention of the ample factual support attached to the motion as exhibits. (2-ER-139–76.) Long did not merely provide "assertions alone"; he provided evidence of applicable prison policies, contemporaneous inmate request forms and grievances showing the development of Defendants' conduct, official response letters, and declarations of himself and five other inmates. (2-ER-145– 76.) Because Long provided competent evidence showing a dispute of material fact, the district court erred in granting summary judgment for Defendants.

11

**B.** **On Long's First Amendment retaliation claim against Antonio, Long presented evidence showing genuine issues of material fact as to whether Antonio moved Long to the high-security facility to retaliate against him for filing grievances.**

**1.** **Defendants do not dispute that the district court properly found Long met the first three elements of a retaliation claim.**

To establish a viable claim of First Amendment retaliation against Antonio, Long must meet five elements: (1) Antonio took an adverse action against Long, (2) "because of" (3) Long's protected conduct, (4) which chilled the exercise of Long's First Amendment rights, and (5) "did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

The opening brief stated that the district court correctly ruled that Long satisfied the first four of these elements. (1-ER-47–49.) Defendants do not dispute that elements 1, 3, and 4 were met. (AB at 19.) But they contend that the district court found that elements 2 and 5 were not satisfied. The district court's ruling is somewhat unclear. The court found the analysis of the second element, the "retaliatory motive factor," collapsed into the fifth. (1-ER-49). But the district court also discussed evidence in Long's favor on the second element, noting

12

that the suspect timing of Long's transfer, days after filing a grievance, provided evidence of a possible retaliatory motive. (1-ER-49.) In any event, to the extent the district court ruled that the second element rises or falls with the fifth element, Long satisfied that element, as discussed below.

> **2. The district court erred in finding there was no triable issue of fact on two of the elements—the retaliatory motive and the legitimate penological interests elements.**

The fifth element of a prisoner retaliation claim looks to whether the defendant acted in the absence of legitimate correctional goals. (AOB 41–42 (citing *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).) This Court has repeatedly held that where there is a genuine dispute of material fact as to retaliatory motive, Defendants' one-sided justification for an official's action cannot defeat summary judgment. (AOB 42 (first citing *Johnson v. Ryan*, 55 F.4th 1167, 1202 (9th Cir. 2022); then citing *Bruce*, 351 F.3d at 1289).)

The district court erred in finding there was no disputed issue of fact as to whether Antonio's acts were solely to advance a legitimate correctional goal. The district court made that finding based on Antonio's stated justification, failing to view the evidence and make all

13

reasonable inferences in the light most favorable to Long. (AOB 42–44.) As noted in the opening brief, the timing of Long's transfer supports an inference that the move was pretextual, as do the declarations of other inmates regarding Sugai's propensity to bully and harass prisoners. (AOB 43–44.) The district court itself recognized that "[s]uspect timing provides some evidence of retaliatory intent here," meaning a genuine issue of material fact existed. (1-ER-48.)

The opening brief pointed out striking parallels between Long's situation and the prisoner in *Shepard v. Quillen*, 840 F.3d 686 (9th Cir. 2016), who was placed in segregation the same day he complained that an officer assaulted him. (AOB 44–46.) Officials in *Shepard* claimed they transferred the inmate under a policy requiring an inmate's removal after making a complaint, but officials also wrote on an administrative form that the prisoner was moved because he was a security threat. (AOB 44–45 (citing *Shepard*, 840 F.3d at 688–90).) Like in *Shepard*, Long was transferred shortly after submitting grievances, and there was no evidence in the summary judgment record indicating Long was a security threat to the prison, although Antonio cited security as the reason for the transfer. (AOB 44–45; AB 32 n.5 (noting

that Antonio transferred Long under the prison's policy, which allows segregating prisoners from the general population "when their continued presence in general population presents an immediate threat to the safety of self or others . . . or endangers institutional security").) This Court in *Shepard* found a triable issue regarding retaliatory animus and whether the move advanced legitimate correctional goals and reversed summary judgment. (AOB 45.) Here, too, the suspect timing, along with the inconsistencies in Antonio's account, lead to the conclusion that there was a triable issue of fact as to whether Antonio's transfer of Long furthered a legitimate correctional goal. (AOB 46.)

Defendants contend that, unlike in *Shepard*, there were no inconsistencies in Defendants' reasons for transferring Long from the medium-security facility to the high-security facility. (AB 21.) But there were, in fact, logical inconsistencies in the reasons for transferring Long, which appear in Defendants' own brief—they simultaneously contend that Long was transferred pursuant to a prison policy to segregate prisoners who present a security threat, while also arguing that Long was *not* deemed a security threat. (*See* AB 32 n.5 (citing the prison's policy reason supporting Antonio's transfer of Long to the high-

security facility, which states prisoners may be segregated from the general population "when their continued presence in general population presents an immediate threat to the safety of self or others, jeopardizes the integrity of an investigation . . . , or endangers institutional security"); *see also* AB 21 (asserting Long was never transferred because he was a threat to prison security).) These similarities with *Shepard*—the suspect timing of Long's transfer and the inconsistencies in reasons for the transfer—support the proposition that the court should have found a triable issue regarding retaliatory motive and whether the move was pretextual, and erred when it granted summary judgment.

Defendants argue that even if a reasonable juror could find Sugai was primarily responsible for the deteriorating relationship, that "does not undermine the legitimacy of the reasons for transferring Plaintiff." (AB 22.) Defendants contend Antonio transferred Long because administrative barriers prevented him from transferring Sugai instead. (AB 22.) But this is only one side of the story. Long submitted a competing theory for why he was transferred—that the move was retaliatory in response to his submission of grievances—which created a

dispute of material fact. At summary judgment, the court cannot act as a factfinder and choose which story is true.

Finally, Defendants stress that the declarations of other inmates do not create an issue of material fact because the declarations are from a period outside the scope of Long's complaint. But drawing all reasonable inferences from these declarations, which showed Sugai was a "bully that runs the kitchen through intimidation and threats," a reasonable juror could find the declarations support Long's contentions that Sugai was consistently harassing and threatening him, as he did to several other prisoners. (AOB 44; 2-ER-164, 167, 170, 173 (inmate declarations).) Long offered sufficient evidence to create a genuine issue of fact that should not have been disposed of on summary judgment.

### 3. The error in dismissing Long's retaliation claim against Antonio was not harmless.

Defendants argue that the district court's dismissal of Long's retaliation claim against Antonio was harmless because, when the case proceeded to trial, the district court found that Antonio's actions had a "lawful justification" of reducing tensions and thus were related to a legitimate penological interest. (AB 23.)

17

However, the district court's conclusion that there was a legitimate penological interest in transferring Long was based on a factual finding that Long was a threat to prison security, a finding that was not supported by the evidence, as discussed further in Part III.A.

### C. The district court improperly granted summary judgment on Long's Free Exercise claim against Lee.

#### 1. The district court applied the wrong standard and incorrectly held there was no genuine issue of material fact that Lee substantially burdened Long's religious practice.

When the district court granted summary judgment on Long's Free Exercise claim against Lee, the court did not address whether Lee substantially burdened Long's religious practice, but relied instead on an Eighth Amendment case, *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993), which held that serving cold food does not amount to cruel and unusual punishment. (AOB 48.) Under the correct First Amendment substantial burden analysis, there is a genuine issue of material fact because, during Ramadan, Lee served Long hot meals at 3:30 p.m., placing substantial pressure on Long to either eat the food then and break his Ramadan fast or wait until 7:30 p.m. and eat spoiled

and congealed food that violated the prison's own safe food temperature policy. (AOB 48–49.)

Defendants double down on the district court's misguided analysis of Long's Free Exercise claim by reiterating that prisoners do not have an Eighth Amendment right to hot meals. (AB 26–27.) But Long never claimed he has a constitutional right to hot food. Rather, Long's claim is a Free Exercise claim, arguing that the forced choice between breaking his Ramadan fast to eat safe food at the temperature it was intended to be eaten or eating congealed and inedible food substantially burdened his observance of Ramadan.

None of the cases that Defendants cite support the district court's ruling. Many of those cases hold only that serving cold food does not violate the Eighth Amendment, an issue not presented here. (AB 26–27 (first citing *Laufgas v. Speziale*, 263 F. App'x 192, 198 (3d Cir. 2008); then citing *Sawyer v. Jeffries*, 315 F. App'x 31 (10th Cir. 2008); then citing *Poindexter v. Lee*, No. 17CV00386, 2018 WL 3617890 (W.D. Va. July 30, 2018); and then citing *Ruffin v. Hinkley*, No. 17-cv-00151-NT, 2017 WL 3670659 (D. Me. Aug. 25, 2017)).) That Eighth Amendment issue is completely irrelevant to whether Lee substantially burdened

19

Long's religious rights by serving him food intended to be eaten hot hours before Long could eat it, allowing it to become congealed, inedible, and unsafe—instead of providing food appropriate for room-temperature storage, or serving hot food after sunset.

Defendants cite six out-of-circuit, nonprecedential cases involving First Amendment or Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims, but all are distinguishable. Three of the cases involved complaints by prisoners about having to eat cold food that was always intended to be cold and appropriate to eat at that temperature. In *Saddiq v. Trinity Services Group*, 198 F.Supp.3d 1051, 1058–59 (D. Ariz. 2016), a prison provided Muslim inmates with a "shelf-stable sack meal" that was designed to be served at room temperature, while providing hot "enhanced" meals for Passover and Christmas. The district held that this was neither a substantial burden nor an Equal Protection violation. *Id.* at 1065. Likewise, in *Jaami v. Compton*, No. 98-5055, 1999 WL 455374, at *1 (6th Cir. June 23, 1999), the Sixth Circuit, in an unpublished order, rejected plaintiffs' claim that cold breakfast during Ramadan violated their Free Exercise rights. Similarly, in *Green v. Tudor*, 685 F.Supp.2d 678, 691, 702–03 (W.D.

Mich. 2010), the court found plaintiff's claim that receiving cold meals,

and subsequently complaining about those cold meals, disturbed his

"peaceful aura" during Ramadan did not substantially burden his Free

Exercise rights. Long's claim is different because he has never claimed

cold or shelf-stable food, in and of itself, would infringe his observance

of Ramadan. He is not claiming that it would diminish his Ramadan

experience to eat food that did not need to be kept hot. Instead, he

claims that he was served hot food hours before he could eat it, forcing

him to choose between eating spoiled and congealed food or breaking his

fast and eating the food while it was still safe and edible. (2-ER-100–

01.)

The other three out-of-circuit cases involved situations where

prisoners were served cold food only occasionally. For example, in

*Crump v. Best*, No. 10-13787, 2012 WL 1056806, at *7, *8 (E.D. Mich.

Mar. 5, 2012), a prisoner ate at most six cold or undercooked meals

during Ramadan. In *Kwanzaa v. Mee*, No. 09-5132, 2011 WL 2580396,

at *10 (D.N.J. June 28, 2011), an inmate alleged several, but not all, of

his meals during Ramadan were delivered early so they became cold.

He alleged that the milk served with his meal became spoiled, but never

alleged his *meals* became spoiled or inedible. *Id.* Lastly, in *Couch v. Jabe*, 479 F.Supp.2d 569, 585 (W.D. Va. 2006), an inmate ate cold meals for part of Ramadan during an extended prison lockdown when the kitchen was unavailable due to safety concerns. More importantly, unlike in this case, there was no contention that the cold food in *Couch* was inedible, rotten, or spoiled, forcing the inmate to choose between his health and his religion. Here, by contrast, on *every day of Ramadan* Long was served hot food that became cold and inedible during normal prison conditions. (2-ER-100–01.)

> **2.** **Long presented evidence that Lee's refusal to provide him with hot food during Ramadan did not serve any legitimate correctional goal.**

Neither the Defendants' brief nor the district court's ruling address the second element of Long's Free Exercise claim—whether Lee's conduct was not reasonably related to legitimate correctional goals. As explained in the opening brief, triable issues of fact exist on this element because a jury could reasonably reject Lee's stated reasons for denying Long appropriate food as pretextual or that his refusal to investigate alternatives evidenced a lack of legitimate penological interests. (AOB 51–52.)

**3.  Long did not waive the issue of whether Lee is entitled to qualified immunity.**

The district court's summary judgment order contained a footnote stating that Long's claim would be barred by qualified immunity if it did not fail on the merits, without adding any legal analysis beyond that used to rule against Long on the substance of his claims. (*See* 1-ER-34 n.3.) Defendants claim that since Long did not address that footnote in the opening brief, he waived his right to dispute the application of qualified immunity. (AB 27–28.) But this Court should not find waiver because Long briefed the substance of the issue and because several waiver exceptions apply.

First, the qualified immunity issue was not waived because Long briefed the substance of the issue. The district court's qualified immunity ruling was identical to its ruling on the merits—the court cited an Eighth Amendment case and held that there is no constitutional right to a hot meal. (1-ER-34 n.3.) As noted in the opening brief and above, the court's reasoning was legal error because the question was whether Lee substantially burdened Long's Free Exercise rights, not whether Long had an Eighth Amendment right to hot meals. Having explained why the court's reasoning was wrong on

23

the merits, there was no need to repeat the same arguments to address the court's identical qualified immunity analysis.

Even if this Court finds that a qualified immunity argument should have been explicitly labeled as such in the opening brief, it should overlook any technical shortcomings. "[T]he waiver rule is not one of jurisdiction, but discretion." *United States v. Northrop Corp.*, 59 F.3d 953, 957 n.2 (9th Cir. 1995); *see Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals.").

This Court has recognized several waiver exceptions. This Court will review issues not presented in an appellant's opening brief (1) "for 'good cause shown', Fed.R.App.P.2, or 'if a failure to do so would result in a manifest injustice'"; (2) the appellee raised the issue in their brief; (3) "the failure to raise the issue properly did not prejudice" the appellee's defense; or (4) the issue is "purely one of law" and the record need not be further developed. *United States v. Ullah*, 976 F.2d 509, 513–14 (9th Cir. 1992) (citation omitted); *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).

24

Here, there is good cause for this Court to review the issue of qualified immunity to prevent a manifest injustice. In *Ullah*, this Court addressed the issue of plaintiff's unlawful conviction by a non-unanimous jury verdict, even though plaintiff failed to raise it in his opening brief, because it was necessary to correct a "plain error" and "prevent a miscarriage of justice." 976 F.2d at 514 (citation omitted). Here, too, the district court committed clear error in applying the incorrect substantive law to determine qualified immunity, and this Court's intervention is necessary to prevent a miscarriage of justice: the complete barring of any relief.

As noted, the analysis is the same as that on the merits, so Defendants are at no risk of any unfair surprise. And any failure to address qualified immunity in the opening brief did not, in fact, prejudice the Defendants. They briefed the issue on the merits in their appellee's brief. *See* AB 27–28; *see also Ullah*, 976 F.2d at 514 (finding no prejudice because "[t]he government's consolidated brief responded to [appellants'] claims and fully addressed the issue").

Lastly, qualified immunity is a pure question of law. *See Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017) (finding that the process of

determining qualified immunity requires "comparing a given case with existing statutory or constitutional precedent[, thus] is quintessentially a question of law"); *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009) ("[W]hether the right was clearly established . . . is a question of law."). Defendants do not dispute the facts underlying Long's claim against Lee. The issue in this case simply comes down to a question of law: whether Long's right to observe Ramadan with safe food, and without coercion, was clearly established. This is a question of law that does not require any further development of the record.

Given that Long's argument against qualified immunity is identical to the argument on the merits raised in his opening brief, that there is no prejudice to Defendants, that there are no factual disputes regarding Lee's conduct, and that qualified immunity is a question of law, this Court should find no waiver.

> **4. Qualified immunity is inapplicable because Long had a clearly established right to be free from pressure to abandon his religious beliefs and a proper religious diet.**

This Court reviews de novo whether a public official is entitled to qualified immunity. *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir.

2021). Officials are not entitled to qualified immunity when their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted).

The district court's footnote stated that qualified immunity applies because Long has no clearly established right to hot food. (1-ER-34 n.3.) But Long never claimed the right to hot food; Long claimed the right to a safe religious diet and to be free from coercive pressure to abandon his religious practices. These Free Exercise rights are clearly established under this Court's precedents. This Court has stressed, "[i]nmates . . . have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (alteration in original) (quoting *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987)); *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997) (citation omitted). And this Court has held that inmates have the First Amendment right to be free from government actions that exert substantial pressure on an adherent to abandon their religious beliefs. *See* AOB 47; *see also Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015) ("It was well

27

established in 2007, and remains so today, that government action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs."); *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008) ("[A] prison policy that 'intentionally puts significant pressure on inmates . . . to abandon their religious beliefs . . . imposes a substantial burden on [the inmate's] religious practice.'" (quoting *Warsoldier*, 418 F.3d at 996)). Long's rights to a safe religious diet and freedom from coercive prison official action that pressures him to abandon his religious beliefs are clearly established and gave Lee a fair warning that his conduct was unconstitutional.

## III. On the claims that went to trial, the district court made key factual findings that were unsupported by the evidence.

### A. The evidence presented at trial did not support the factual finding that Long posed a security threat.

The district court conducted a bench trial on Long's Free Exercise and retaliation claims against Sugai and Long's Free Exercise claim against Antonio, and disposed of these claims based on a factual finding that Long posed a threat to prison security and, therefore, the

28

Defendants' actions promoted security, a legitimate penological interest. (AOB 57; 1-ER-77–78, 81–82, 87.)

The finding that Long posed a security threat was not supported by any evidence in the record. (AOB 59–62.) The only evidence presented at trial that Long posed any threat to security was that he filed a grievance and was "argumentative" with kitchen staff. (AOB 62.) Sugai recalled Long "arguing or debating [his] dislikes with the food service staff" (3-ER-335–36) but never described Long as disruptive. The district court took this vague and mild testimony about Long's behavior and made an unreasonable and unsupported inference that Long posed a "significant" security risk. (1-ER-78, 82.) Long had the right to argue and debate the meals he was receiving because Halawa continually failed to provide him a Halal, or similar, diet that he was entitled to under the First Amendment. (*See* 2-ER-98, 107, 146, 148, 149, 150.) Raising that issue is not tantamount to Long posing a "significant" threat to security. *See Jones v. Williams*, 791 F.3d at 1036 ("A prisoner's 'impolitic choice of words' does not categorically justify punitive action by prison officials." (citation omitted)). Notably,

29

Defendants presented no evidence that any official ever disciplined Long for his behavior in custody.

Rather than showcasing evidence to support the finding that Long was a security threat, Defendants pretend as if the district court made no such finding. (AB 31 ("There is no factual finding that Plaintiff was a "'significant threat" to institutional security[.]'" (alteration in original) (citation omitted)).) They contend that the district court only found that "there would have been a significant impact on institutional security" if Long had not been transferred, but they contend that does not amount to a finding that Long himself posed a threat to security. (AB 31.)

Defendants' argument cannot be reconciled with the district court's order. The district court repeatedly claimed Long risked, threatened, or impacted prison security. (1-ER-78 ("Accommodating Plaintiff's right to maintain his religious diet without any restrictions— i.e., permitting him to eat non-pork meals in the cafeteria—would have impacted HCF staff and inmates (including Plaintiff) by threatening their safety and security. . . . "[T]here was a significant threat of escalatory behavior that needed immediate attention."); 1-ER-82 ("[T]here would have been a significant impact on institutional security

given the rising tensions between Sgt. Sugai and Plaintiff. . . .

"[F]urther delaying the separation of Plaintiff from Sgt. Sugai [would]

threaten[ ] institutional security.") In addition, the district court found

that the purpose behind the policies permitting Sugai and Antonio to

move Long was to remove inmates who posed a security risk. (1-ER-77

(noting "[t]he governmental interest behind" the policy Sugai acted

under was "obviously security"); 1-ER-81 (noting Antonio acted under

prison policy that allowed him to move inmates to high security "when

their continued presence in general population presents an immediate

threat to the safety of self or others . . . or endangers institutional

security").) These findings leave no doubt that the district court did, in

fact, conclude—without evidentiary support—that Long posed a

security threat, a finding central to the court's disposition of Long's

claims.

The only other possible interpretation of the order, and what

Defendants' argument suggests, is that the district court found that

*Sugai* was a threat to Long. If Long was never a security threat, Sugai

was the sole aggressor, escalating tensions to a point that required

Long's removal. In other words, an inmate raising legitimate

31

constitutional concerns caused a prison official to become so irate and retaliatory that the inmate had to be removed from the situation and placed in a punitively restrictive high-security area *for his own safety*. If Defendants are arguing on appeal that inmates at Halawa are at so great a bodily risk of harm from the officials who run the facility that the only way to keep them and the prison safe is to transfer the inmates to a more restrictive facility, there is even less "legitimacy" to Defendants' penological methods.

This Court should not condone a finding that lacks any evidentiary support, especially when this Court has stressed in the First Amendment context that "[t]he threat of punishment for an impolitic choice of words" substantially burdens an inmate's rights. *Bradley v. Hall*, 64 F.3d 1276, 1281 (9th Cir. 1995). There is no legitimate penological interest in returning an inmate to eat alone in his cell, or sending him to a high-security facility, when no evidence was presented at trial that Long ever used or threatened force, committed a rule violation, received any formal discipline, or otherwise posed any threat to institutional security.

**B.     No evidence supported the court's denial of Long's Free Exercise claim against Antonio on the ground that transporting Long required increased "personnel commitments."**

The district court decided Long's Free Exercise claim against Antonio based not only on the unsupported notion that Long posed a security threat, but also on the premise that it would have taken additional resources to transfer Long to the medium-security facility to attend Jumu'ah prayer services. (AOB 62–65; 1-ER-81–82.) The court found that transferring Long would require "personnel commitments." (AOB 64; 1-ER-83.) But, the testimony at trial contradicts the district court's conclusion because Antonio testified transportation between the medium-security and high-security facilities already runs daily from 6:00 a.m. to 6:00 p.m., and only inmate transportation "*outside of that time*" would require additional resources. (AOB 64; 3-ER-272 (emphasis added).) Antonio acknowledged that inmates can be transferred between the two facilities for other purposes, such as for medical visits, but not for religious purposes. (AOB 64; 3-ER-271.)

Defendants argue Antonio's testimony "properly supported" the court's finding that it was "infeasib[le]" to transport Long to his religious services. (AB 34; 1-ER-71.) They claim that "transport[ing]

33

[Long] by vehicle in full restraints with a dispatch of security officers that would remain with [him] while he attended Jumu'ah service" would "[l]ogically . . . mean that the security officers assigned to transport Plaintiff between facilities would not be able to engage in their other duties." (AB 34–35.)

The Defendants' argument contradicts Antonio's testimony. Antonio specifically testified that "[m]ost of the transport officers [were] scheduled from six [a.m.] to . . . six p.m." and only outside that twelve-hour window "would [Antonio] have to pull officers from other assigned posts to make the transport." (3-ER-271–72.) This testimony indicates that officers were scheduled to transfer Long for midday Jumu'ah prayer services, and it would not have required pulling officers from other assigned duties. Antonio even conceded transfers already occurred during these hours for specific reasons. (*See* 3-ER-271.) It does not matter that it would require resources to transport Long; the relevant inquiries were whether there were "ready alternatives" to transferring Long to high-security and whether it was impractical to transport Long to attend Jumu'ah services. (*See* AOB 64 (quoting *Shakur*, 514 F.3d at 884 (citation omitted)).) Antonio's testimony answers those questions

34

clearly: no additional resources were needed to transport Long; officers were scheduled and ready to transport Long and other prisoners for medical visits between 6 a.m. and 6 p.m. Running those already-available transfer vans is an "obvious, easy alternative" to depriving Long of an important religious service, and demonstrates that this objection is an "'exaggerated response' to prison concerns." *Turner v. Safley*, 482 U.S. 78, 80, 90 (1987) (citation omitted), *superseded by statute on another ground*, RLUIPA of 2000, Pub. L. No. 106-274, § 3, 114 Stat. 803, 804 (codified at 42 U.S.C. § 2000cc-1).

This Court should remand the Free Exercise claim against Antonio to reweigh the *Turner* factors because had the district court not drawn impermissible inferences contrary to the evidence, all factors would have weighed for Long, and the judgment would have been in his favor.

## CONCLUSION

For these reasons, this Court should reverse and remand for further proceedings.

September 29, 2023  **HORVITZ & LEVY LLP**
       CURT CUTTING
       REBECCA G. POWELL
      **PEPPERDINE CARUSO SCHOOL OF LAW**
      **NINTH CIRCUIT APPELLATE**
      **ADVOCACY CLINIC**
       MAXWELL LYSTER (Certified Law Student)
       MACY MERRITT (Certified Law Student)

      By:      s/ Curt Cutting

      Attorneys for Plaintiff-Appellant
      **DE WITT LAMAR LONG**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15997

I am the attorney or self-represented party.

**This brief contains** | 6,736 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

    ☐ complies with the length limit designated by court order dated

    ☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Curt Cutting | **Date** | September 29, 2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*